**UNITED STATES of America,**

v.

**Anthony J. PIXLEY, Defendant.**

**No. CRIM. 98–73(GK).**

United States District Court, District of Columbia.

July 8, 1998.

Patricia Stewart, Assistant U.S. Attorney, Washington, DC, for U.S.

Bernard Grimm, Grimm & Associates, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSION OF LAW

KESSLER, District Judge.

Defendant has filed a Motion to Suppress Statements and Tangible Evidence [# 9]. The Motion seeks to suppress a gun which was found in his home at the time of his arrest on December 19, 1997, as well as all statements he made at the time of his arrest and interrogation. On June 25 and 26, 1998, the Court held an evidentiary hearing on the Motion. At that time the Court denied the Motion to Suppress statements, for the reasons stated on the record, and took under advisement the Motion to Suppress Tangible Evidence. Upon consideration of the evidence presented at the suppression hearing, the applicable case law, and the arguments of counsel the Court rules as follows:

### Findings of Fact

On December 19, 1997, at approximately 5 a.m., a group of 10 to 12 FBI agents arrested the Defendant Anthony Pixley and his wife Donna Covington–Pixley, in their home at 108 Webster Street, NE, Washington, D.C. The agents were executing arrest warrants for both Mr. and Mrs. Pixley on bank fraud charges then pending in federal court in Greenbelt, Maryland.

The agents knocked loudly on the front door of the Defendant's home. Mr. Pixley was in the upstairs bedroom with his wife and upon hearing the agents identifying themselves, immediately answered the door and let them in. He was then, in the jargon of the FBI, "secured", i.e., he was forced to lie face down on the floor, handcuffed, and

rendered harmless. He immediately identified himself as Anthony Pixley, his identity was confirmed, and he was then formally arrested. These events occurred within a very short time span of several minutes.

Mrs. Covington–Pixley emerged from the bedroom to see what was happening. Five or six agents dashed up the staircase and immediately executed their arrest warrant for her, i.e., they forced her to lie face down on the floor, handcuffed her, and formally arrested her.[1]

The agents, all with guns drawn, fanned out into the two other upstairs bedrooms. In one they found the Pixleys' 14–year old son. After checking under the bed and in the closet, the boy was left alone. In the other bedroom they found two teen-age girls, one of whom was the Pixleys' daughter and the other of whom was the daughter's close friend. Despite their youth, their highly emotional states at the 5 a.m. police intrusion, and Mrs. Covington–Pixley's cries that "they were only children", the FBI agents handcuffed the girls for somewhere between 15 and 45 minutes.

The agents then went into the Pixleys' master bedroom, looked in a closet, lifted up the mattress to look under the bed, and found a .38 caliber Rossi revolver containing six rounds of .38 caliber ammunition. The discovery of the gun under the bed occurred approximately 15–20 minutes after the handcuffing and subsequent arrest of Mr. Pixley and approximately 10 minutes after the arrest and handcuffing of Mrs. Covington–Pixley.

The agents were aware, when they went into the Pixley home, that Mr. Pixley had a 1984 conviction for Murder in the Second Degree.

Much of the conflicting testimony at the hearing centered on the precise dimensions of the Pixleys' bed, i.e., how far off the floor it was, whether an adult could slide under it, what the skirt of the bed cover revealed, the distance between the bed's bottom rung and the floor, etc. Based upon that testimony, as well as the size of a particular boot which was admitted in evidence, the Court finds that the distance between the bottom of the bed and the floor was sufficiently narrow that a person could not in fact have hidden under the bed.

## CONCLUSIONS OF LAW

All counsel agree that this Motion is governed by two cases, one from the Supreme Court and one from our Court of Appeals: *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), and *United States v. Ford*, 56 F.3d 265 (D.C.Cir.1995).

■ In *Buie* the Supreme Court held that the Fourth Amendment permits a properly limited "protective sweep" conducted incident to an in-home arrest on a warrant in order to protect the safety of police officers or others. The Court emphasized that a " 'protective sweep' is a quick and limited search of premises, . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding." 495 U.S. at 327, 110 S.Ct. 1880. The test for the propriety of such a protective sweep is whether "the searching officer 'possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing,' [citations omitted] that the area swept harbored an individual posing a danger to the officer or others." *Id.*

In *Ford*, as in *Buie* and in this case, the police made a warrantless search of the home in which they were executing an arrest warrant. Our Court of Appeals, building on the *Buie* analysis, concluded that the officers lacked articulable facts to support a belief that the bedroom, in which a gun clip was found after the arrest, harbored someone posing a danger to officers on the scene. 56 F.3d at 265.

■ *Ford* and *Buie* both identified two different types of protective sweeps. The first "requires no probable cause or reasonable suspicion," 56 F.3d at 268, and involves a

---

1. Mrs. Covington–Pixley was, given the early hour, dressed only in a nightgown. Her obvious anger, when testifying, at being forced to lie down in an undignified position with part of her anatomy exposed, was most understandable.

"very circumscribed...'look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched'", 56 F.3d at 268–9 quoting *Buie*, 494 U.S. at 334, 110 S.Ct. 1093. The second requires, as already noted, " 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.' " 56 F.3d at 269 (quoting *Buie*, 494 U.S. at 334, 110 S.Ct. 1093). This second type of sweep, which is "aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.' " *Id.* The facts of this case fit squarely within the analysis articulated in *Ford*.

■ As to Mr. Pixley himself, the protective sweep in this case cannot involve the first type of *Buie* sweep, for which neither probable cause nor reasonable suspicion is required, since it did not involve "look[ing] in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334, 110 S.Ct. 1093. Rather, a second floor bedroom was searched while Mr. Pixley was fully restrained on the first floor; obviously the search was not of "spaces immediately adjoining the place of arrest." Moreover, even if the protective sweep was viewed as falling under *Buie's* first prong, *Ford* makes clear that such a search "is very circumscribed, and did not permit Agent [Saale] to search under the mattress or behind the window shades." 56 F.3d at 270.

The protective sweep, at least as to Mr. Pixley, was therefore clearly the second type of *Buie* sweep. In *Ford,* the Court of Appeals rejected the argument that the arresting officers' knowledge of Ford's prior arrests and the current warrant for a homicide justified their assumption that he was armed and dangerous. In this case, Mr. Pixley's

conviction for Second Degree Murder was 14 years old, and his arrest warrant was for a non-violent white collar crime. Moreover, in the present case, as in *Ford,* the significant fact is that "when [the arresting officers] began [their] sweep, appellant had already been arrested and placed in the custody of the police officers." 56 F.3d at 269. Here, both Mr. and Mrs. Pixley had been arrested, handcuffed, and fully secured—without any resistance, denial of identity, or attempt to flee—before the agents moved on to search the master bedroom. As the Court of Appeals noted in another recent protective search case, "[o]nce appellant was in custody, he no longer posed a threat to the police." *United States v. Henry,* 48 F.3d 1282, 1284 (D.C.Cir.1995).

As to Mrs. Covington–Pixley, who is not a defendant herein, a better case can be made that the protective sweep was of *Buie's* first type. The master bedroom which was searched was certainly close to—although not clearly "immediately adjoining"—the hallway in which she was lying face down, handcuffed. But even assuming that it was "immediately adjoining" Mrs. Covington–Pixley's place of detention, the fact remains that at the time of the search both she and her husband were fully secured and in custody, thereby no longer posing a threat to the police. See *Henry,* 48 F.3d at 1282. Finally, as noted earlier, the *Ford* court emphasized the "very circumscribed" nature of a protective sweep under the first Buie prong which did not permit the agent to search under the mattress. 56 F.3d at 270.

Even if the protective sweep was deemed, as to Mrs. Covington–Pixley, to be of *Buie's* second type, "the record here is clear that Agent [Saale] possessed no articulable facts which would have led him to believe that the area he searched harbored an individual posing a danger to those on the arrest scene." 56 F.3d at 269.[2]

---

**2.** The government cites *Henry,* 48 F.3d at 1282, to demonstrate a case in which the Court of Appeals found an objectively reasonable and articulable basis to conduct a protective sweep. In that case, however, the officers had received a

warning from an informant that the defendant would have weapons, and that his "boys" or confederates might be with him. No such evidence was offered in this case.

The government offers two justifications for the agent's lifting of the mattress in the master bedroom: the presence of the three children on the second floor and the fear that someone was hiding under the mattress who might crawl out and attack them. As to the first justification, by the time of the search the two young girls had already been handcuffed and secured, and the agents had determined that it was not necessary to handcuff and secure the Pixleys' teen-age son. Therefore, any safety issues about the presence of the three teen-agers had been satisfactorily resolved in the minds of the agents before they entered the master bedroom. As to the second justification, the record was clear from the testimony of family members, from the photographs placed in evidence, and from the actual size of a shoe which was used in one of the photographs to demonstrate the height of the bed and was then admitted into evidence for demonstrative purposes, that the agents could not have held a *reasonable* suspicion that someone could have fit under the bed and then crawled out to attack them.

For all the foregoing reasons, the Court concludes that the Defendant's Motion to Suppress Tangible Evidence must be granted.