UNITED STATES of America

v.

Ernest B. WEIDUL, Defendant

No. CRIM NO. 02–10–P–H.

United States District Court,
D. Maine.

Aug. 7, 2002.

David R. Beneman, Levenson, Vickerson & Beneman, Portland, ME, for Ernest B. Weidul, defendant.

Helene Kazanjian, Office of the U.S. Attorney, Portland, ME, for U.S.

## ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on July 9, 2002, with

copies to counsel, his Recommended Decision on Motion to Suppress.

The government filed an objection to the Recommended Decision on July 23, 2002. I have reviewed and considered the Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

I observe that the government no longer presses the exigent circumstances argument and that it also accepts the Magistrate Judge's factual findings. Based on the record that the government created at the suppression hearing and the Magistrate Judge's findings, I agree with his conclusion that a reasonable person (including an officer) would not conclude that Ms. Malloch gave consent to the search.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The defendant's motion to suppress evidence, as clarified during oral argument to be limited to the warrantless search of the Malloch home and seizure of a Jennings J–22 .22 caliber pistol, serial number 280812, is GRANTED.

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

DAVID M. COHEN, United States Magistrate Judge.

Ernest B. Weidul, charged with being a felon in possession of a firearm (a Jennings model J–22 .22 caliber pistol, serial number 280812) in violation of 18 U.S.C. §§ 922(g) and 924(e), seeks to suppress physical evidence seized as the product of a warrantless search and seizure in Kennebunk, Maine, on January 11, 2001. Indictment (Docket No. 1); Defendant Weidul's Motion To Suppress, etc. ("Motion") (Docket No. 8) at 1.[1] An evidentiary hearing was held before me on July 2, 2002 at which the defendant appeared with counsel. Oral argument immediately followed the hearing; in addition, the government submitted a post-hearing memorandum. *See* Government's Supplemental Memorandum in Opposition to Defendant's Motion To Suppress (Docket No. 12). Based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the motion to suppress be granted.

### I. Proposed Findings of Fact

At approximately 10:10 p.m. on January 11, 2001 mental-health crisis-response worker Kathleen Hobbs, working from offices in the emergency department of Southern Maine Medical Center ("SMMC") in Biddeford, Maine, fielded a hotline call from a man who ultimately identified himself to her as Ernest Weidul. Weidul told Hobbs he would "blow his head off" when she hung up the phone and that there was nothing she could say or do to stop him. Hobbs heard a tapping noise and asked Weidul what it was; he told her that he was holding a loaded .22 in his hand two inches from his face, and the barrel of the gun was tapping against the phone. Weidul seemed to Hobbs to be slurring his words and intoxicated. Hobbs heard a woman screaming in the background, "Oh my God, don't do it, don't do

---

1. The Motion sought to suppress any statements made by Weidul as well as any physical evidence seized following a warrantless arrest, search and seizure on January 11, 2001. *See* Motion at 1. However, during oral argument on July 2, 2002 defense counsel conceded that the warrantless arrest of Weidul was proper and clarified that he sought only suppression of the firearm.

it." She asked Weidul who the woman was; Weidul said she was his fiancée but refused to allow Hobbs to speak with her.

As Hobbs was talking to Weidul, she signaled her co-worker, crisis-response worker Kate Gallagher, to phone the police. Gallagher, who had ascertained that the call was coming from a residence in Kennebunk, phoned the Kennebunk Police Department. Per protocol, Hobbs kept Weidul on the line as long as possible. As the conversation continued, Hobbs scribbled notes to Gallagher, who in turn relayed this information to the Kennebunk police dispatcher. Specifically, Gallagher told police that Weidul was threatening suicide, had a loaded .22 in his hand, had been drinking, had two boxes of ammunition and was threatening to shoot police officers. She also relayed that Weidul was at his fiancée's house at 1 Wallace Street, that his fiancée was with him and that he would not allow his fiancée to talk to crisis-response workers. After about five minutes, Weidul hung up on Hobbs, reiterating that there was nothing she could do to stop him from killing himself.

Sergeant Harry Dumont and patrol officers Wayne Etheridge and Zachary Brooks Harmon of the Kennebunk Police Department responded to the emergency call, agreeing to meet at a "staging area" on Beach Street, near (but not visible from) 1 Wallace Street. Pursuant to a mutual-aid agreement between the towns of Kennebunk and Kennebunkport, Sergeant Keith Mills of the Kennebunkport Police Department also was called in to assist. While the officers were en route, the Kennebunk police dispatcher received a phone call from a woman who identified herself as Trish Malloch at 1 Wallace Street, who reported that Weidul had passed out asleep, that there was no gun involved, and "that's all there was to it." The dispatcher, who was in simultaneous communication with officers en route, asked Malloch to meet the officers outside her house, and she agreed.

Mills knew Weidul from two previous law-enforcement encounters in which Weidul had threatened to shoot his mother, father and/or sister, and considered Weidul a very dangerous man. Mills also knew Malloch from her work and from minor traffic stops, but had no reason to believe she was not permitted to possess a firearm. Harmon did not know Weidul personally but had been warned prior to the incident in question to approach him with caution should the need arise inasmuch as Weidul had a propensity for violence and a history of mental instability. Harmon knew Malloch from previous minor traffic stops and chance encounters. He perceived her as somewhat unstable and as a "cop nut"—fascinated by weapons and professing an interest in becoming a police officer herself.

Dumont, Mills, Etheridge and Harmon met at the prearranged staging area and quickly devised a plan whereby Etheridge and Harmon were to "set up a perimeter," using their patrol cars to block off access to both ends of Beach Street within one hundred yards of Wallace Street, and Mills and Dumont were to meet Malloch, enter the Malloch residence and attempt to take Weidul into protective custody. All four police officers were in uniform and in marked patrol cars.

Per plan, Etheridge and Harmon set up a perimeter on Beach Street, and Dumont and Mills met Malloch outside her home. They conversed with Malloch as they moved past her into the home, asking her where Weidul and the gun were. Malloch told them Weidul was upstairs sleeping and denied that there was a gun. She did not protest their entry. Mills perceived

Malloch as "cooperative" with police, albeit "distraught with the situation." [2]

Dumont and Mills proceeded up the stairs, yelling "police." Although there was a light on in the hallway, the upstairs was dimly lit enough that the officers decided to use flashlights for illumination. Mills saw a still form in a bed in one of the upstairs bedrooms. The officers cautiously approached and ordered the person to show his hands. They got no response. Dumont pulled the covers back to check for weapons and found none. Weidul was lying prone on the bed non-responsive, apparently sound asleep. Dumont sat Weidul up in bed while Mills checked for a weapon under his pillow, finding none. At approximately this time, Dumont radioed Etheridge and Harmon to bring their cruisers in toward the house and come in to assist.

Mills then turned his attention to handcuffing Weidul, but decided against using the standard handcuffs he had with him when he noticed healing lacerations on Weidul's wrists. He left Weidul with Dumont, went back out to his cruiser, retrieved some plastic "flexcuffs," returned and flexcuffed Weidul. Weidul was groggy, lethargic and incoherent; however, he did tell Mills and Dumont words to the effect, "Just shoot me now." After Weidul was flexcuffed, Mills took a quick look around the bed to make sure there were no weapons in reach. He spied a gun-cleaning kit and a small, uncovered plastic box containing medication bottles and .22–caliber ammunition.

When Harmon entered the house, Malloch was sitting in an armchair in her living room. She said "hi" to Harmon, and

he said hello. Harmon went upstairs to see if he could help. Mills, Dumont and Harmon escorted the still-groggy Weidul down the stairs and out to the waiting patrol car of Kennebunk police officer Anthony Clukey, who, upon the start of his shift at 10:30 p.m., had been detailed to transport Weidul from the Malloch residence to SMMC. Clukey immediately departed with Weidul for SMMC.

Mills, Dumont and Harmon returned to Malloch's downstairs living room. Mills could not recall whether the officers' weapons were drawn at any point prior to Weidul's departure; however, he was certain that no weapons were drawn after Weidul left. Etheridge had remained inside the Malloch living room, and Malloch was sitting in the same armchair conversing with Kennebunk police captain Mike LeBlanc, who had arrived on the scene at some time subsequent to Mills' and Dumont's initial entry. However, neither Mills nor Harmon overheard the conversation between LeBlanc and Malloch.[3] Malloch's teenage daughter was running in and out of the house, crying, because in the commotion the officers had let her dog out. An older teenage daughter was expected home shortly from work.

None of the officers had a search warrant. However, in Malloch's presence, LeBlanc instructed the officers to ensure for safety reasons that there were no weapons in the house. Malloch did not protest, order the officers out or otherwise tell them not to conduct the search. To Harmon, she appeared "blasé"—unconcerned that a search was transpiring and engaging in what seemed to Harmon to be "small talk" with LeBlanc. Mills began looking around the living room and saw

2. On cross-examination, Mills acknowledged that he had previously testified before a grand jury that Malloch was upset that the police were there.

3. Neither Malloch nor LeBlanc was called to testify at the evidentiary hearing held before me.

ammunition rounds in plain view, on shelves and on the floor next to the chair where Malloch was sitting. However, he found no weapons in the living room.

Harmon proceeded toward the kitchen (adjacent to the living room), telling Malloch, "I'm going to look in here, okay?" After a few moments sizing up the cluttered kitchen, Harmon moved on to a small laundry room adjacent to the kitchen, telling Malloch, whom he could still see from that vantage, "I'm going to look in here." Malloch responded, "Okay." Harmon began kicking piles of dirty clothes on the floor. His boot soon struck something metallic. He reached down, found a .22–caliber handgun, and called out "gun" to his fellow officers to alert them to his discovery. Harmon ejected a magazine filled with several rounds from the gun, ejected a live round from the gun's chamber and handed the weapon to another officer. The officers continued to search for approximately another hour, finding no other weapons.[4]

Neither Mills nor Harmon knew whether Weidul would be released following his assessment at SMMC. In fact, Weidul was arrested and jailed for violating probation following his release from SMMC.

## II. Discussion

■ The Supreme Court "consistently has held that warrantless searches and seizures in a home violate the Fourth Amendment absent consent or exigent circumstances." *Griffin v. Wisconsin*, 483 U.S. 868, 883, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (Blackmun, J., dissenting). The government bears the burden of demonstrating that at least one of these exceptions exists. *See, e.g., United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir. 1985) ("The burden of showing exigent circumstances rests upon the government."); *United States v. Esquilin*, 42 F.Supp.2d 20, 27 (D.Me.1999), *aff'd*, 208 F.3d 315 (1st Cir.2000) ("[W]hen [the government] seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given.") (citation and internal quotation marks omitted).

Here, the government relies upon both consent and exigent circumstances to justify the warrantless search that ultimately yielded the weapon in issue. It carries its burden of proof as to neither.

I turn first to the claim of exigency. "Exigent circumstances exist where law enforcement officers confront a compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir.1995) (citations and internal quotation marks omitted). By the time Harmon and other officers began systematically searching for weapons in the Malloch home, Weidul was being transported in flexcuffs to SMMC. Nonetheless, in the government's view, circumstances remained exigent in that: (i) for all anyone knew, Weidul upon his release from SMMC might have returned to the home, and (ii) regardless, any concealed weapons

4. During oral argument immediately following the evidentiary hearing, defense counsel questioned Harmon's credibility given his "attitude" and discrepancies between his and Mills' testimony (*e.g.*, as to whether the "staging area" was a Franciscan monastery or an inn elsewhere on Beach Street, whether Weidul was handcuffed when Harmon first saw him, whether Harmon observed Mills leaving the residence to obtain the flexcuffs, and whether Harmon did or did not assist in getting Weidul downstairs to Clukey's patrol car). I judged Harmon to be a credible witness. That the officers' testimony as to these sorts of less important details would diverge is not particularly surprising, given the speed with which events were unfolding up to the time Weidul was taken into custody and the tension of the circumstances until then.

themselves posed a danger to Malloch and her teenage children. However, when asked at oral argument if there was any reason the police could not have secured the Malloch home while one of their number obtained a warrant, counsel for the government could think of none.

· Weidul, the only person known to have posed a danger to anyone's safety, had been removed prior to the search; there was no longer any reason to believe anyone was in imminent danger of attack. Lingering safety concerns notwithstanding, any exigency had ended.[5] *See, e.g., Parkhurst v. Trapp,* 77 F.3d 707, 711 (3rd Cir.1996) (For circumstances "to qualify as exigent, the officers reasonably must believe that someone is in imminent danger.") (emphasis in original); *United States v. Doe,* 61 F.3d 107, 110 n. 5 (1st Cir.1995) ("[A]ny exigency adequate to support a warrantless search for explosives lapsed at or about the time of Pizarro's arrest, since he obviously would not be permitted to remain at large in the airport or to board an aircraft."); *United States v. Pixley,* 7 F.Supp.2d 52, 54–55 (D.D.C.1998) (warrantless search for weapon after couple was handcuffed did not qualify as "protective sweep" within meaning of *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); test for propriety of such a protective sweep is "whether the searching officer possesse[d] a reasonable belief based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably

warrant[ed] the officer in believing ... that the area swept harbored an individual posing a danger to the officer or others."); *compare, e.g., United States v. Bartelho,* 71 F.3d 436, 442 (1st Cir.1995) (exigency persisted when police had reason to believe armed suspect remained in home); *United States v. Henry,* 48 F.3d 1282, 1284 (D.C.Cir.1995) (exigency persisted, even after suspect taken into custody, when officers had been informed that suspect's so-called "boys" or "counterparts" might have accompanied him).

■ I finally consider the question of consent. "Valid consent renders a warrantless search constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." *United States v. Perez–Montañez,* 202 F.3d 434, 438 (1st Cir.2000). "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." *Id.* (citation and internal quotation marks omitted).[6] "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities." *Id.* This interaction, in turn, is measured by a standard of "objective rea-

**5.** I note that while one might question the wisdom of concealing a loaded weapon in a home (particularly a home in which minor children are present), a person lawfully in possession of a weapon may legally do so.

**6.** While the question sometimes is framed as one of whether consent has been "freely and voluntarily" given, the concepts are equivalent. *See, e.g., United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 2113, 153 L.Ed.2d

242 (2002) ("We turn now from the question whether respondents were seized to whether they were subjected to an unreasonable search, *i.e.,* whether their consent to the suspicionless search was involuntary."); *United States v. Chhien,* 266 F.3d 1, 7 (1st Cir.2001) ("Consent is voluntary if it is the product of an essentially free and unconstrained choice.") (citation and internal quotation marks omitted).

sonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Turner*, 169 F.3d 84, 87 (1st Cir.1999) (citations and internal quotation marks omitted).[7]

■ At oral argument, the government contended that Malloch both expressly and impliedly consented to the search that yielded the .22 caliber pistol—expressly, by stating "okay" when Harmon told her that he was going to search the laundry room, and impliedly, by her generally cooperative (even friendly) demeanor. The facts, as I have found them, simply do not stretch that far.

Malloch was not at all initially receptive to a police search of her home for weapons; instead, she called the Kennebunk police dispatcher in a futile attempt to head off police intervention, emphasizing that there was no gun. Mills admitted that when the police did ultimately arrive, Malloch was distraught at least in part because they were there. The government adduced no evidence that anyone, at any point, actually asked Malloch for her permission to do anything. Instead, the conduct of the officers from the moment of their arrival at 1 Wallace Street bespoke a steely determination both to remove Weidul and to find and remove any weapons in the home—consent notwithstanding.

After Malloch met Mills and Dumont outside her home, the two officers literally moved past her into her residence, hurrying up the stairs to find Weidul. As defense counsel conceded, the officers' initial entry and taking of Weidul into protective custody were entirely warranted by the then-existing exigency of the circumstances. However, this entry set the tone for the evening. From all that appears, the officers continued to believe (in good faith, but erroneously) that they had a right, even a duty, to rid the Malloch house of weapons, thereby ensuring the safety of Malloch, her minor children and the public at large.

The record does not reveal that LeBlanc sought or received Malloch's permission to search; instead, he ordered his officers to commence a search of the entire premises that lasted at least one hour past the point at which Harmon found the weapon in question. As Malloch sat in her living-room armchair, four uniformed officers (Mills, Dumont, Harmon and Etheridge) combed at LeBlanc's direction throughout her house. Tellingly, Harmon did not ask Malloch whether he could search either the kitchen or the laundry room; he had no reason to do so, having been ordered by his boss to conduct the search in question. Instead, he told her he was about to do so.[8] Under all of these circumstances, Malloch's uttering of the word "okay" as Harmon stated that he was about to search the

***

7. There is no question, in this case, that Malloch had "standing," or authority, to consent to the search of the premises. *See, e.g., United States v. Woodrum*, 202 F.3d 1, 9 (1st Cir. 2000) ("[W]hen the prosecution seeks to justify a warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.") (citation and internal quotation

marks omitted). As noted earlier, 1 Wallace Street is Malloch's residence.

8. I recognize that Harmon's initial comment to Malloch was technically a question: "I'm going to look in here, okay?" However, under all of the circumstances, a reasonable person would have understood this to be more in the nature of a declaration than a genuine request for permission. In fact, Malloch did not even respond to this initial comment.

laundry room (meanwhile walking purposefully in that direction) was not a consent to search—it was a simple acquiescence to what any reasonable person would have perceived, under the circumstances, as police conduct tantamount to a claim of lawful authority to search for weapons. *See, e.g., United States v. Zurosky*, 614 F.2d 779, 789 n. 11 (1st Cir.1979) (consent could not be inferred from defendants' conduct in escorting officers who boarded vessel to search point if one were to credit defendants' version of story "that they were told that the vessel was to be searched, and the only option they had was as to its location."); *Robbins v. MacKenzie*, 364 F.2d 45, 49 (1st Cir.1966) ("We agree . . . with cases holding that courts should be skeptical of a purported consent to a search made after the officer had been admitted. Acquiescence in such a case may well be mere 'bravado,' or may be granted in the belief that by now there is no choice.") (citations omitted); *compare, e.g., United States v. Esquilin*, 208 F.3d 315, 317–18 (1st Cir.2000) (express consent found when suspect stated, after being asked if he minded officers looking around to make sure there were no drugs in his hotel room, "No, go ahead, look anywhere you want").

Nor can one, under these circumstances, infer voluntary consent to a household-wide search for weapons from Malloch's seemingly cooperative conduct—*i.e.*, her lack of protest, her greeting of Harmon when he first walked into her house, her seeming "blasé" attitude as the search unfolded or her making of "small talk" with LeBlanc. As the First Circuit has cautioned, "where the officer's real objective is search and seizure the householder's consent should not only be clearly voluntary, but also specifically directed toward search and not merely toward entry." *MacKenzie*, 364 F.2d at 49. Unlike cases in which consent to the precise act in question can be inferred from conduct, in this instance Malloch's "small talk," greeting of Harmon, seeming "blasé" attitude and so forth had no particular connection to or bearing on the household-wide search for weapons. *Compare, e.g., id.* at 48 ("When a householder, knowing the identity and purpose of his caller, opens his door and turns back inside, he expresses by his actions as adequate a consent to entry as he would by a verbal invitation."); *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir.1994) ("Appellant freely surrendered the keys to both the doors and the trunk; and it is settled law that the act of handing over one's car keys, if uncoerced, may in itself support an inference of consent to search the vehicle.").

Under the totality of these circumstances, a reasonable person would not understand the police to have sought, or Malloch to have given, consent to a search of her home for the presence of weapons.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence, as clarified during oral argument to be limited to the warrantless search of the Malloch home and seizure of a Jennings J–22 .22 caliber pistol, serial number 280812, be GRANTED.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument*

*before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

July 9, 2002.