**UNITED STATES of America Plaintiff,**

v.

**Christopher LAWLOR, Defendant.**

**No. CRIM.03–45–B–W.**

United States District Court,
D. Maine.

May 3, 2004.

See, also, 2003 WL 22431931.

Brett D. Baber, Law Office of Brett D. Baber, Bangor, ME, for Christopher Joseph Lawlor (1), Defendants.

James L. McCarthy, U.S. Attorney's Office, Bangor, ME, for USA, Plaintiff.

## ORDER REJECTING RECOMMENDED DECISION OF MAGISTRATE JUDGE AND DENYING DEFENDANT'S MOTION TO SUPPRESS

WOODCOCK, District Judge.

### I. Introduction

Early in the morning of May 29, 2003, the Maine State Police received a call about a fracas at the home of the Defendant, Christopher Lawlor. The call came from the employee at a golf course across the road and alerted the police that two men were fighting and gunshots had been heard. The first trooper on the scene saw Mr. Lawlor in his driveway wielding a 3½ foot 2 × 4 and threatening to strike Christopher Tomah. The men were highly agitated and highly intoxicated. After handcuffing Messrs. Tomah and Lawlor, the trooper conducted a warrantless search of the Lawlor home; in plain view inside the house, the trooper saw a .12 gauge shotgun.[1] The Defendant moves to suppress evidence seized as a result of the warrantless search. Despite a Recommended Decision from the Magistrate Judge to grant the motion, this Court having made a *de novo* determination following an evidentiary hearing DENIES the motion to suppress on the ground that the trooper was faced with exigent circumstances justifying a warrantless search.

### II. Factual and Procedural History [2]

At 6:58 a.m. on May 29, 2003, the Maine State Police barracks received a telephone

---

1. The trooper also saw, in plain view, drugs and drug paraphernalia. The Defendant moved to suppress any evidence seized during the search.

2. At the close of the evidentiary hearing on March 30, 2004, the Defendant strenuously contended that because the Maine State Troopers testified to facts not in their affida-

call from Andrew McLaughlin, an employee at a golf course across the street from the Defendant's residence in Enfield, Maine. McLaughlin reported seeing two men fighting outside the Defendant's residence and hearing a gunshot. McLaughlin did not see who fired the shot, but he observed a man standing in the driveway with his hands up.

At approximately 7:00 a.m., the barracks dispatched State Troopers Thomas Fiske and Barry Meserve to the Defendant's residence. Both troopers were familiar with the location. Trooper Fiske arrested the Defendant's father at the house in 1998 or 1999. Since that time, both troopers patrolled the area regularly, having received intelligence of potential drug-related activity at the house. The troopers had noticed the Defendant's residence often had two or three vehicles going "in and out" and individuals "coming and going." Trooper Fiske thought both the Defendant and his brother, Kevin Lawlor, were living in the house at the time.[3]

Trooper Fiske, in uniform and wearing a bulletproof vest, arrived at the residence first, where he saw the Defendant and another man, later identified as Christopher Tomah, in an altercation in the driveway. The Defendant had a 3½ foot long 2 × 4 raised over his shoulder, poised to strike Tomah. At the evidentiary hearing, Trooper Fiske testified that he could tell the men were "impaired," as they were yelling at each other, were obnoxious, and had slurred speech. Trooper Fiske also saw a woman, later identified as Ann Delaite, standing in the doorway to the house. Trooper Fiske drew his revolver, ordered both men to the ground, and handcuffed them for his own safety. Soon after, Trooper Meserve arrived.

Neither the Defendant nor Tomah had a gun. Trooper Fiske asked the Defendant where the gun was located. Initially, the Defendant denied knowledge of any guns. However, he then asked Trooper Fiske which gun he was talking about, as there were several inside the house. Trooper Fiske told the Defendant that for safety purposes, he needed to secure the gun that had been used that morning. The Defendant simply shrugged his shoulders. Trooper Meserve continued to watch the men, both of whom were still on the ground and yelling at each other. Trooper Fiske proceeded toward the house. Trooper Fiske testified he went inside the Lawlor home to secure the firearm and to ensure the safety of himself and others.

As Trooper Fiske approached, he noticed two spent .12 gauge shotgun shells near the entrance to the doorway.[4] Inside, he found a .12 gauge shotgun. The barrel had been unscrewed from the receiver and Trooper Fiske could tell the gun had been fired recently. Trooper Fiske also observed in plain view a straw and a dinner plate, each caked in white powder. Based on his training and experience, Trooper Fiske recognized the powder as consistent with cocaine.

vits and police reports, the new information raised issues as to the troopers' credibility. The Court disagrees. The new evidence consisted of the troopers' testimony about their experience in law enforcement, familiarity with the Defendant and his family, and knowledge of the Defendant's residence. The Court has carefully reviewed the contents of the police report and contrary to the Defendant's contention, the troopers' testimony at the evidentiary hearing does not contradict the contents of the report.

3. At the evidentiary hearing, defense counsel established that Kevin Lawlor was in custody in the Maine State Prison as of May 29, 2003.

4. Trooper Fiske later found a third spent shotgun shell in the same area.

While Trooper Fiske was inside, the Defendant told Trooper Meserve a sawed-off shotgun had been used that morning and offered to show Trooper Meserve where it was located. After Trooper Fiske emerged from the house, the Defendant and Tomah were arrested and transported to jail. Trooper Fiske obtained a warrant to search the Defendant's residence for drugs, drug paraphernalia, firearms, and ammunition, all of which were then seized.

Defendant Christopher Lawlor was indicted on July 1, 2003. On August 25, 2003, Mr. Lawlor moved to suppress evidence of the warrantless search. (Docket # 10). Counsel agreed no evidentiary hearing was required and on October 23, 2003, the Magistrate Judge filed her Recommended Decision to grant the Defendant's Motion to Suppress. (Docket # 16). On November 3, 2003, the Government filed an Objection to the Recommended Decision (Docket # 17) and, on November 11, 2003, the Defendant filed a Response to the Government's Objection (Docket # 18). On December 5, 2003, the Government filed a Reply to the Defendant's Response

(Docket # 19). This Court scheduled an evidentiary hearing on the matter for February 24, 2004. After the Defendant failed to appear,[5] the Court rescheduled the evidentiary hearing and conducted it on March 30, 2004.[6]

### III. Discussion

The Fourth Amendment sets a general proscription against warrantless searches of a person's home:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

U.S. Const. amend. IV. The prohibition against warrantless searches is not absolute; nevertheless, a warrantless search "involving an intrusion into someone's home is presumptively unreasonable under the Fourth Amendment." *United States v. Beaudoin*, 362 F.3d 60, 65 (1st Cir.2004).

5. On December 9, 2003, the Magistrate Judge granted an *ex parte* Motion for Revocation of Order of Release and Issue for Warrant for Arrest of the Defendant (Docket # 20) after the Government submitted a motion alleging the Defendant violated conditions of his release. Prior to the February 24, 2004 hearing, defense counsel said that he had not been able to contact the Defendant. The Defendant was brought into custody on March 4, 2004.

6. At the commencement of the March 30, 2004, evidentiary hearing, the Defendant moved to strike the hearing and proceed solely on the prior record on the ground that the parties had previously agreed to waive an evidentiary hearing. This Court denied the motion. On October 6, 2003, Magistrate Judge Kravchuk held a telephone conference with counsel to determine whether an evidentiary hearing was necessary. Counsel agreed such a hearing was not necessary. The Mag-

istrate Judge stated: "I will then consider the motion formally submitted on the papers as neither side is pressing for an evidentiary hearing." Following the Recommended Decision and the Government's objection, this Court ordered an evidentiary hearing under its 28 U.S.C. § 636 authority. Section 636 requires the Court to make a *"de novo* determination of those portions of the recommendations to which objection is made." It further provides, in part: "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." To conclude that this Court is bound by evidentiary stipulations before the Magistrate Judge would countermand the Court's statutory obligation to perform a *de novo* review and the statutory authority to receive further evidence.

Privacy expectations for one's own home are "quite strong," and, therefore, searches "usually may not be made in a person's home unless the police have obtained a search warrant based on probable cause." *Id.* at 72 (stating also Fourth Amendment has "drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant") (Lipez, J., dissenting); *Payton v. New York*, 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

■ There are "a few specifically established and well-delineated exceptions" to the warrant requirement, including the exception that police may enter a private premises and conduct a search if "exigent circumstances" mandate immediate action. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This group of exceptions is known as the doctrine of exigent circumstances. *Beaudoin*, 362 F.3d at 66. The exigent circumstances usually recognized include: (1) risk to the lives or health of the investigating officers; (2) risk that the evidence sought will be destroyed; (3) risk that the person sought will escape from the premises; and (4) "hot pursuit" of a fleeing felon. *Id.; see generally Johnson v. United States*, 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir.), *cert. denied*, 537 U.S. 1161, 123 S.Ct. 966, 154 L.Ed.2d 897 (2003); *United States v. Wilson*, 36 F.3d 205, 209 (1st Cir.1994); *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir. 1963). In *Beaudoin*, the First Circuit applied a fifth exigent circumstance exception to the warrant requirement: "an emergency situation in which the police must act quickly to save someone's life or prevent harm." *Beaudoin*, 362 F.3d at 66.

Under any of these exceptions, the test to determine the sufficiency of the exigen-cy is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant. *United States v. Bartelho*, 71 F.3d 436, 442 (1995). In *Bartelho*, the Court explained:

> This necessarily fact-based inquiry ... requires that we consider factors including the gravity of the underlying offense, whether a delay would pose a threat to police or the public safety, and whether there is a great likelihood that evidence will be destroyed if the search is delayed until a warrant can be obtained.

*Id.* (internal citations omitted).

The Government bears the burden of proving a warrantless entry falls within an exigent circumstance exception. *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *United States v. Rutkowski*, 877 F.2d 139, 141 (1st Cir. 1989). Once in a person's home during legitimate exigent circumstances, police officers may seize any evidence in plain view. *See Michigan v. Tyler*, 436 U.S. 499, 509–10, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Holloway*, 290 F.3d at 1335.

In this case, the Government seeks to justify the warrantless search of the Defendant's residence on the following grounds: (1) as a search to ensure the safety of the officers and others under the emergency doctrine; (2) as a "protective sweep"; (3) as a quick visual search to prevent the removal or destruction of evidence while a search warrant was obtained; and (4) because the Defendant consented to the search and discovery of the items was inevitable.

### A. Emergency Doctrine

One of the most compelling events giving rise to exigent circumstances is an emergency situation, *Holloway*, 290 F.3d at 1335 (citing *Michigan*, 436 U.S. at 509, 98 S.Ct. 1942), such as the need to protect

or preserve life, *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Holloway,* 290 F.3d at 1335, 1337 ("It is difficult to imagine a scenario in which immediate police action is more justified than when a human life hangs in the balance"); *Wayne,* 318 F.2d at 212 ("The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency"). In *Beaudoin,* the First Circuit reasoned that while it had not explicitly addressed the "emergency situation," recognition of "some type of emergency doctrine is entirely consistent . . . with the logic of traditional exigency exceptions to the warrant requirement." [7] 362 F.3d at 66 (citing also *Bilida v. McCleod,* 211 F.3d 166, 171 (1st Cir.2000), where Court offered "imminent threat to the life or safety of the public, police officers, or a person in residence" as example of exigent circumstance).

■ Generally, under the emergency doctrine, there must be a reasonable basis, sometimes said to be approximating probable cause, both to believe in the existence of the emergency and to associate that emergency with the area or place to be searched. *Id.* (citations omitted). The analysis must be with reference to the circumstances confronting the officers, including the prompt assessment of some-times ambiguous information concerning potentially serious consequences. *Id.*

■ However, the appropriateness of warrantless entry under the emergency doctrine cannot be determined by the extent to which human life was actually in danger. Instead, "when policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need . . . to protect life or property, they are authorized to act on that information, even if ultimately found erroneous." *Wayne,* 318 F.2d at 212. That no victims are found, or that the hurried and incomplete information on which officers have to base their decisions ultimately proves to be false or inaccurate, does not render the action any less lawful. *See id.; Holloway,* 290 F.3d at 1340. As long as the officers reasonably believe an emergency situation necessitates their warrantless search, such actions must be upheld as constitutional. *Id.*

■ In *Holloway,* the Eleventh Circuit applied the emergency exception to circumstances similar to those at hand. Responding to multiple 911 calls reporting gunshots at a residence, police officers secured three individuals who had been standing outside the location. As the officers were doing so, they noticed a child in the doorway of the house. An officer approached the house and, as he stepped

---

7. In *Wayne,* then-Judge Burger explained the policy behind the emergency doctrine:

> The appraisal of exigent circumstances surrounding execution of search warrants or forcible entries without a search warrant . . . do not arise in the calm which pervades a courtroom or library. They are rarely if ever seen by courts except in cases where criminal activity has been uncovered by the challenged police actions. They are not matters resolved by meditation and reflection of the participants. The events are likely to be emotion-charged, filled with tension, and frequently attended by grave risks. Neither the Constitution, statutes or judicial decisions have made the home inviolable in an absolute sense. Collectively they have surrounded the home with great protection but protection which is qualified by the needs of ordered liberty in a civilized society. . . . Police should not be required to lay siege to an apartment to await a search warrant while a life may be at stake.

318 F.2d at 211–12, 214. The Eleventh Circuit echoed that rationale in *Holloway:* "Although the Fourth Amendment protects the sanctity of the home, its proscription against warrantless entries give way to sanctity of human life." 290 F.3d at 1337.

onto the porch, saw a shotgun and shotgun shells where one of the individuals had been standing. The officer secured the weapon and searched the house for victims; none was found. The individual who possessed the shotgun was convicted of felony possession of a firearm and the Eleventh Circuit considered his motion to suppress the weapon.

Affirming the lower court's denial of the motion, the Eleventh Circuit reasoned "emergency situations involving endangerment to life fall squarely within the exigent circumstances exception." *Holloway*, 290 F.3d at 1337. The Court continued:

> When the police reasonably believe an emergency exists which calls for an immediate response to protect citizens from imminent danger, their actions are no less constitutional merely because the exigency arises on the wooden doorsteps of a home rather than the marble stairs of a public forum.

*Id.* The officers responded to a 911 call replaying shots of gunfire; nothing at the scene dissuaded them from believing the veracity of the 911 call; and, the presence of the individuals at the scene supported the information conveyed in the 911 call. *Id.* at 1338. Such circumstances led the officers to "reasonably believe[ ] an emergency situation justified a warrantless entry of [the individual's] home for victims of gunfire." *Id.* The Court noted:

> The possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating immediate search.... Additionally, based on ... the personal observations of the officers, there was probable cause to believe a person located at the residence was in danger.

*Id.*

Here, Trooper Fiske reasonably believed an emergency situation justified a warrantless entry of the Defendant's home to search for victims of gunfire, potential assailants, and the gun itself. Immediately prior to entry, Trooper Fiske knew the following information: he had been dispatched to the scene in response to a report of gunshots and an altercation in the area of the residence; the residence was located across the street from a golf course; two inebriated men were involved in a violent altercation; at least one of those men resided at the house; the other man was *not* the Defendant's brother, whom Trooper Fiske thought lived at the house at that time; the Defendant had frequent visitors and guests; neither man was armed; there were several firearms inside the house; at least one person stood in the doorway; and, there were spent shotgun shells near the entrance to the house.

However, neither Trooper Fiske nor Trooper Meserve knew the following: who had fired the shots that morning; whether anyone had been injured by the shots; where the gun that fired the shots was located; whether there was anyone else inside the residence and, if so, whether he or she was injured or was poised to injure the troopers or others at the scene. Trooper Fiske responded to a dispatch call reporting shots of gunfire and, as in *Holloway*, nothing at the scene dissuaded him from believing the veracity of the dispatch call. In fact, the scene at the residence confirmed the information conveyed in the call. Given the troopers' concerns and the Defendant's admission that there were firearms in the house, Trooper Fiske justifiably conducted a warrantless search under the emergency doctrine.

The Defendant argues there was, in fact, no emergency. No one else was in the house. The shotgun was unattended in a smaller room off the living room. No one had been hurt. No one posed an "imminent threat to the life or safety of the

public, police officers or a person in the residence." *Beaudoin*, 362 F.3d at 66 (quoting *Bilida*, 211 F.3d at 171). But, as noted earlier, the Court's proper analysis is "essentially one of reasonable suspicion," not whether the suspicion proves ultimately true. *Beaudoin*, 362 F.3d at 67. Thus, in *Beaudoin*, the First Circuit upheld a warrantless search where the police had received a tip that there was a dead body in a motel room, even though upon investigation no dead body was found.

The Defendant can also posit alternatives to the warrantless search. The police could have staked out the property and sought a warrant, called in the SWAT Team, or subjected the Defendant and Mr. Tomah to further questioning. But, as in *Beaudoin*, the alternatives were "hardly required." *Beaudoin*, 362 F.3d at 70. If there had been an injured or dangerous person inside the house, the police "would have been foolish" to delay investigation. *Id.* Further, there was no reason to believe that additional interrogation of the two intoxicated, angry men handcuffed in the driveway would have revealed the truth.[8]

The "calm that pervades a courtroom," *Wayne*, 318 F.2d at 212, did not pervade the Lawlor lot that morning. Confronted outside with two violent, inebriated men, knowing a firearm had been discharged, aware the firearm was missing and was likely inside the residence with other firearms, and not knowing whether another violent, inebriated man was, at that moment, sighting them with the firearm, the troopers acted reasonably and prudently in securing the premises. As did the officers in *Holloway*, Trooper Fiske promptly assessed the limited information at hand and executed the warrantless search in light of the potential imminent threat to the life and safety of the public, the troopers, and people possibly within the residence.[9]

This case is distinguished from *United States v. Weidul*, 227 F.Supp.2d 161 (D.Me.2002), on which the Defendant relies. In *Weidul*, police officers removed a man from his house after he threatened to commit suicide with a handgun. As some of the officers transported the man to a local hospital, others conducted a warrantless search of his home for weapons. The government argued exigent circumstances justified a warrantless search in that the man might have returned to his home following his release from the hospital and concealed weapons posed a threat to the man's fiancee and her teenage daughters, all of whom remained in the house. Magistrate Judge Cohen, in a Recommended

---

8. The same could be said of Ann Delaite, Mr. Tomah's girlfriend. Ms. Delaite had been sleeping upstairs when the fight broke out between Tomah and Lawlor and shots were fired. She had the good sense to leave the Lawlor residence, but the equally bad sense to return. There is no indication in the record that when Trooper Fiske arrived at the doorstep, Ms. Delaite was in a position to know whether there was anyone inside the Lawlor house or that the troopers should have thought she would be truthful.

9. Neither the *Holloway* officers' observation of the child in the doorway nor the discovery of the shotgun *outside* the individual's home erodes *Holloway's* instructive value to the case at hand. Although immediately seeing another person in the Defendant's home would have bolstered the troopers' safety concerns, not immediately seeing another person in the Defendant's home certainly did not allay their safety concerns. The troopers had no reason to believe no one else was in the house and they had every reason to believe there was a gun inside the house. Further, while the officer in *Holloway* discovered the shotgun outside the individual's home, the Eleventh Circuit explicitly stated that the endangerment to life exception justified the warrantless entry. 290 F.3d at 1338. The Court did not temper its holding with the fact that the shotgun at issue was discovered outside the house.

Decision affirmed by the District Court, disagreed:

> [W]hen asked at oral argument if there was any reason the police could not have secured the [ ] home while one of their number obtained a warrant, counsel for the government could think of none. Weidul, the only person known to have posed a danger to anyone's safety, had been removed prior to the search; there was no longer any reason to believe anyone was in imminent danger of attack.

227 F.Supp.2d at 166. But, as noted, the troopers in this case did not know that the only persons posing a danger had been secured.

### B. Protective Sweep

■ A "protective sweep" is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The Supreme Court explained police officers' authority to conduct a protective sweep in *Maryland v. Buie:*

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and *without probable cause or reasonable suspicion,* look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and

*Long* and as in those cases, we think this balance is the proper one.

*Id.* at 334, 110 S.Ct. 1093 (emphasis added). Whether a formal arrest occurred prior to or followed "quickly on the heels" of the challenged search does not affect the validity of the search, so long as there existed probable cause prior to the search. *Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Bizier,* 111 F.3d 214, 217 (1st Cir.1997). To establish probable cause, "the government must demonstrate that at the time of the arrest, the facts and circumstances known to all officers involved were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *Bizier,* 111 F.3d at 217 (citations omitted).

Here, the record supports Trooper Fiske's claim that he searched the house to secure the gun used and to ensure the safety of himself and others. As discussed above, Trooper Fiske had no information to indicate an attack could *not* have been launched from the house and he conducted a search of an area he believed may harbor an individual posing a danger to those within range of the scene. Therefore, the search qualifies as a precautionary sweep within the ambit of *Buie.* That the Defendant's arrest "followed quickly on the heels" of the search does not alter the analysis. *See Rawlings,* 448 U.S. at 111, 100 S.Ct. 2556. As the Recommended Decision indicates, Trooper Fiske clearly had probable cause to search the residence for the missing firearm and to believe that the Defendant had committed an offense with the firearm.

### C. Removal or Destruction of Evidence

■ In *Segura v. United States,* Chief Justice Burger wrote:

[W]here officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

468 U.S. 796, 798, 104 S.Ct. 3380, 82 L.Ed.2d 599. The Government has not established the requisite connection between *Segura* and the case at hand. Neither trooper testified to a concern that the gun used may have been removed or destroyed in the time it would have taken them to obtain a warrant. On the contrary, Trooper Fiske testified that he entered the house to secure the gun and ensure the safety of those at the scene.

### D. Consent and Inevitable Discovery

Finally, in its Objection to the Recommended Decision, the Government raises the Defendant's alleged consent to the search and the inevitable discovery doctrine. The Government did not raise these arguments before the Magistrate Judge in its Objection to the Defendant's Motion to Suppress. (*See* Docket # 11). It is well settled that an unsuccessful party is not entitled to *de novo* review by the district judge of an argument never seasonably raised before the magistrate judge. *Fireman's Insurance Co. v. Todesca Equip. Co.*, 310 F.3d 32, 38 (1st Cir.2002); *see Borden v. Sec'y of Health and Human Serv.*, 836 F.2d 4, 6 (1st Cir.1987) ("Parties must take before the magistrate, 'not only their "best shot," but all of their shots'") (quoting *Singh v. Superintending Sch. Comm.*, 593 F.Supp. 1315, 1318 (D.Me. 1984)). Accordingly, the Court will not consider the Government's consent and inevitable discovery arguments at this time.

### IV. Conclusion

Trooper Fiske's warrantless search of the Defendant's residence was justified under the emergency exception to the warrant requirement and as a protective sweep of the premises. Once lawfully inside the Defendant's home, the troopers were entitled to seize any evidence in plain view. As Trooper Fiske observed the shotgun as well as the cocaine and drug paraphernalia in plain view, the seizure was lawful. Therefore, the Recommended Decision of the Magistrate Judge is REJECTED and the Defendant's Motion to Suppress is DENIED.

SO ORDERED.