# United States Court of Appeals

## For the First Circuit

No. 02-1757

UNITED STATES OF AMERICA,

Appellee,

v.

RODGER BEAUDOIN,

Defendant, Appellant.

No. 02-1850

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT CHAMPAGNE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul Barbadoro, <u>Chief U.S. District Judge</u>]

Before

Lynch, <u>Circuit Judge</u>,
Siler,<sup>*</sup> <u>Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

<sup>*</sup>Of the Sixth Circuit, sitting by designation.

      William E. Christie, with whom Shaheen & Gordon was on brief, for appellant Rodger Beaudoin.
      Joshua L. Gordon for appellant Robert Champagne.
      Terry L. Ollila, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, was on brief for appellee.

March 26, 2004

**LYNCH, <u>Circuit Judge</u>.** This appeal presents interesting questions about the application of the Fourth Amendment when an anonymous tipster informs police that there is a dead body in a motel room.

A series of events cascaded from that tip, resulting in the arrests of Rodger Beaudoin and Robert Champagne on various drug-related charges and a federal prosecution for conspiracy to distribute cocaine and crack and for possession of crack with intent to distribute. 21 U.S.C. §§ 841(a)(1), 846. Before trial, the defendants each moved to suppress all of the evidence that the police had found in a search of them and their motel room, including knives, drugs, drug paraphernalia, and large amounts of cash. After an evidentiary hearing, the trial court, in a thoughtful opinion, denied their motions. The defendants pled guilty but preserved the right to challenge the suppression ruling on appeal, which they now exercise. Champagne also appeals from a sentence enhancement. We affirm both the denial of the suppression motions and the sentence enhancement.

## I.
## Background Facts

The facts are taken from the suppression hearing, as found by the district judge, and supplemented from the record.

At 5:15 in the morning on July 24, 2001, the Manchester, New Hampshire Police Department informed the Hookset Police Department that a dispatcher had just received a 911 call during

which an unidentified person reported "a drug deal gone bad at the Kozy 7 Motel, Room 10" in Hooksett. The caller said "I think there is a dead body in there," and then hung-up before any follow-up questions could be asked.

Three Hooksett officers, Sergeant Chamberlain and Officers Pinardi and Sherrill, were immediately dispatched to the motel, about three miles away. Officer Pinardi understood that the information was that "a drug deal [had] gone bad, during which a person was allegedly shot and there was a dead body." The call transcript itself contains nothing about a shooting, but Pinardi heard the dispatcher conveying the information to Chamberlain. The motel was not upscale and was the sort of place that police had visited before in connection with criminal activity.

The officers arrived several minutes later. They did not attempt to see the motel manager to ask if there was any unusual activity in the room, but instead went straight to the room that the caller had identified. The officers noticed that a light was on in Room 10, but that all of the other rooms were dark. The curtain of the window to Room 10 was closed.

The uniformed officers approached the room; Officers Pinardi and Sherrill took positions on either side of the doorway, while Sergeant Chamberlain stood farther back on the opposite side of the motel room's window. Pinardi stood to the left of the door for "officer safety reasons." Among other things, in that position

he "would be able to see inside the room, see what was going on, and also . . . be able to get out of the way if . . . the door . . . swung open." Officer Sherrill instinctively stood in front of the door, but he moved to the right after Sergeant Chamberlain told him to step away from the door. Sergeant Chamberlain chose a position to the right of the door, by the window, to get "a little concealment or whatever if something did happen in the room, whether there was going to be a shoot-out or whatever." He was concerned for his own safety because of the report that there was a dead body in the room.

Chamberlain, with a view of the window, saw some movement behind the window, and the officers heard some rustling from the room. Pinardi knocked on the door. A man (who was later identified as Beaudoin) drew back the curtains of the window and peered outside toward Chamberlain. There was sufficient light to see the uniformed officers. Chamberlain then identified himself and the others as Hooksett police officers and asked the man to go to the door so they could speak with him. The man, Beaudoin, opened the door, but only wide enough so his face could be seen. Both the interior door and an outer screen door were opened. Sergeant Chamberlain could not recall if Beaudoin pushed the screen door entirely open, or if Beaudoin pushed the screen door part way open and an officer held it open.

Officers Chamberlain and Pinardi presented slightly varying accounts of what transpired next. These differences prove to be immaterial. Officer Pinardi testified that once Beaudoin opened the door, the officers explained to him that they were investigating a crime and had heard that someone had been shot in the room. Pinardi said that he then asked Beaudoin if he could "just come out here" so the police could talk to him and that Beaudoin did so voluntarily. Sergeant Chamberlain, however, testified that he asked Beaudoin to step outside so they could talk to him, which Beaudoin did, and only then explained why the police were there. Either way, Beaudoin stepped outside, leaving the door behind him sufficiently open so that Pinardi could see inside the room. Whether Beaudoin felt free not to step outside is an open question.

Once Beaudoin was outside, Sergeant Chamberlain asked him if he was carrying any weapons. Beaudoin said that he had a knife in his left rear pocket and started to reach for it. Sergeant Chamberlain said that he would remove the knife, ordered Beaudoin to put his hands on the wall, and proceeded to pat him down. During the pat down, Sergeant Chamberlain patted Beaudoin's left rear pocket and felt three objects: an object that seemed to be a knife and two long and hard cylindrical objects that he was unable to identify. Chamberlain reached into the pocket and removed a knife, two glass tubes, and three plastic balls containing crack

cocaine.  The glass tubes and crack cocaine were contained in one plastic bag.  Chamberlain placed Beaudoin under arrest and finished the pat down.  He found $300 in Beaudoin's right front pocket.

While Sergeant Chamberlain was frisking Beaudoin, Officer Pinardi made eye contact with a second man in the motel room, later identified as Champagne, through the open door.  Once Champagne saw Pinardi, Champagne hurried across the room toward the far wall and began to shuffle through some items on top of a dresser and to reach into his pockets.  Pinardi thought it odd that the man, upon seeing the police, did not come toward them to ask why they were there.  Pinardi feared that Champagne was either searching for a weapon or trying to hide evidence, so he and Officer Sherrill entered the motel room and directed Champagne away from the dresser and toward the middle of the room.  Pinardi explained to Champagne that the officers had received a report that there was a dead person in the motel room.  Champagne denied that there was a dead body.

Pinardi asked Champagne if he had any weapons. Champagne, who was nervous, said that he did not, but Officer Pinardi saw that Champagne had a knife clipped to one of his pockets.  Pinardi removed the knife and conducted a protective frisk, holding Champagne's arms behind his back. During the frisk, Champagne became increasingly fidgety and kept attempting to free his hands to reach into the pockets of his pants.  Pinardi patted

-7-

Champagne's right front pocket and felt several long, hard cylinders, which he feared could be small pen guns or knives. Champagne became even more fidgety when Pinardi patted that pocket. When Champagne refused to comply with Pinardi's instruction to stop moving his hands, Pinardi and Sherrill pushed him face down on the bed and handcuffed him. Pinardi told Champagne that he was not under arrest but was being restrained so Pinardi could safely ascertain the nature of the situation in the room. Officer Pinardi still had not looked in the bathroom and had no idea whether there was a dead body inside.

Pinardi and Sherrill helped Champagne to his feet and asked him what was in his front pocket. When Champagne said that he did not know, Pinardi stretched open Champagne's pocket so he could see inside it. With the aid of a flashlight held by Sherrill, Pinardi saw several crack pipes, which were the long cylindrical objects that he had feared were weapons, as well as a substance that later proved to be crack-cocaine. Pinardi seized these items and continued his frisk, finding yet more crack and a wad of cash.

After completing these searches, the officers searched the rest of the motel room for a dead body. When they did not find a body, the officers left behind the contraband they had found and brought Beaudoin and Champagne to the police station. Once a search warrant was obtained, the police returned to the motel room

-8-

and took the contraband found in the searches, as well as additional drug paraphernalia, into police custody. They also found by the door a plugged-in skill saw with its safety cover duct-taped up.

## II.
## Procedural History

Each defendant was indicted on charges of conspiracy to distribute cocaine and crack and possession of crack with intent to distribute. 21 U.S.C. §§ 841(a)(1), 846. Champagne was also indicted on charges of obtaining proceeds from the distribution of crack. Id. § 853. Both defendants moved to suppress all of the evidence that had been seized at or near the motel room, including the drugs found on them and the contraband discovered inside the motel room. The prosecution argued that the request that Beaudoin step out of the motel room doorway was justified by exigent circumstances, such as a Terry stop, and that the evidence subsequently found was admissible under the inevitable discovery doctrine. The trial judge conducted an evidentiary hearing on December 5, 2001. After hearing the testimony of Officer Pinardi and Sergeant Chamberlain and reviewing a transcript of the 911 call and copies of the police reports, the district court judge denied both defendants' motions. The judge held that the officers' initial request that Beaudoin exit his motel room and their later entry into the room were both justified by the emergency assistance exception to the warrant requirement because the officers could

-9-

reasonably have believed that a person inside of the motel room was in need of emergency aid.

The defendants then pled guilty to the crimes charged in the indictment, but reserved their right to appeal the district court judge's denial of their suppression motions. Beaudoin was sentenced to fifty-seven months in prison to be followed by four years of supervised release, and Champagne, to 151 months in prison to be followed by five years of supervised release. In sentencing Champagne, the judge imposed a two-point increase in his offense level based upon his possession of the electric saw, which the judge deemed to be a dangerous weapon. U.S.S.G. § 2D1.1(b)(1).

## III.
## Analysis

### A. Fourth Amendment Issue

The ultimate conclusion on whether the police violated the Fourth Amendment is reviewed de novo. Ornelas v. United States, 517 U.S. 690, 697 (1996). We defer to the district court's factual findings, which we accept. This case does not turn on any disputed issue of fact.

The Fourth Amendment protects people from unreasonable searches and seizures by the government. A warrantless search involving an intrusion into someone's home is presumptively unreasonable under the Fourth Amendment. Groh v. Ramirez, No. 02-811, 2004 U.S. LEXIS 162, at *15-*16 (2004); Steagald v. United States, 451 U.S. 204, 211-12 (1981). The reasonableness of a

-10-

search depends entirely on the context in which it takes place; different Fourth Amendment doctrines as to reasonableness have evolved to fit different contexts.

One set of variants in these doctrines is the degree of the privacy expectations involved. For example, expectations of privacy in a commercial establishment are not strong. See New York v. Burger, 482 U.S. 691, 700 (1987). Privacy expectations in one's home, by contrast, are quite strong. See Groh, 2004 US LEXIS 162, at *15-*16; Kyllo v. United States, 533 U.S. 27, 40 (2001). As such, searches usually may not be made in a person's home unless the police have obtained a search warrant based on probable cause. Payton v. New York, 445 U.S. 573, 586-87 (1980). By analogy, this rule is usually extended to searches in a person's hotel or motel room, which is a sort of temporary home. See Stoner v. California, 376 U.S. 483, 490 (1964); United States v. Bardacchino, 762 F.2d 170, 175-76 (1st Cir. 1985).

Another set of contextual variants are grouped under the doctrine of exigent circumstances. The exigent circumstances usually recognized include: (1) risk to the lives or health of the investigating officers; (2) risk that the evidence sought will be destroyed; (3) risk that the person sought will escape from the premises; and (4) "hot pursuit" of a fleeing felon. See United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995).

-11-

Several courts have recognized another type of exigent circumstance: an emergency situation in which police must act quickly to save someone's life or prevent harm. See United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002); United States v. Richardson, 208 F.3d 626, 630 (7th Cir. 2000); Seymour v. Walker, 224 F.3d 542, 556 (6th Cir. 2000); Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998); Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.). This court has not had occasion to address the emergency doctrine. Recognition of some type of emergency doctrine is entirely consistent, though, with the logic of the traditional exigency exceptions to the warrant requirement. This court implicitly said as much in Bilida v. McCleod, 211 F.3d 166 (1st Cir. 2000), holding that "[w]arrantless entries are most often justified by 'exigent circumstances,' the best examples being hot pursuit of a felon, imminent destruction or removal of evidence, the threatened escape by a suspect, or imminent threat to the life or safety of the public, police officers, or a person in residence." Id. at 171 (emphasis added). And the Supreme Court, in dicta, has said that the Fourth Amendment "does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona, 437 U.S. 385, 392 (1978).

In the end, this case involves the intersection of several Fourth Amendment doctrines, most notably, those of exigent

circumstances, emergencies, and <u>Terry</u>-type temporary detentions during investigations. Generally, under the emergency doctrine, there must be a reasonable basis, sometimes said to be approximating probable cause, both to believe in the existence of the emergency and to associate that emergency with the area or place to be searched.[1] 3 W. LaFave, <u>Search & Seizure</u> § 6.6(a) (3d Ed. 1996); <u>People</u> v. <u>Mitchell</u>, 39 N.Y.2d 173, 177-78 (1976). The analysis must be with reference to the circumstances confronting the officer, including, as one commentator has put it, "the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." LaFave, <u>supra</u>, § 6.6(a); <u>see also</u> <u>Wayne</u>, 318 F.2d at 212 (Burger, J.).

The facts also raise the classic exigent circumstances situation, of a risk to the safety of police officers; the officers were investigating a report of both drug activity and possible deadly criminal activity in the room. Traditional exigent circumstances justify a warrantless search when there is reasonable suspicion that a person poses a threat to the lives or safety of police officers and there is probable cause to believe that a crime has been committed. <u>McCabe</u> v. <u>Life-Line Ambulance Serv.</u>, 77 F.3d

---

[1]A few courts have imported an "intent" requirement, demanding that the officers not be primarily motivated by an intent to arrest and seize evidence. Subsequent Supreme Court case law, we think, eliminates any such intent requirement in favor of a purely objective test. <u>Whren</u> v. <u>United States</u> 517 U.S. 806, 813 (1996); <u>Scott</u> v. <u>United States</u>, 436 U.S. 128, 137 (1978); <u>see</u> <u>United States</u> v. <u>Richardson</u>, 208 F.3d 626, 630 (7th Cir. 2000).

540, 545 (1st Cir. 1996); United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995); Hegarty v. Somerset City, 53 F.3d 1367, 1376 (1st Cir. 1995). But whether or not probable cause for a crime exists, the inquiry determining the existence of an exigency is essentially one of reasonable suspicion. See United States v. Soto-Beniquez, 356 F.3d 1, 36 (1st Cir. 2003); United States v. Lopez, 989 F.2d 24, 26 (1st Cir. 1993).

Further, the government correctly suggests that the detention of Beaudoin was analogous to a Terry stop. Terry v. Ohio, 392 U.S. 1 (1968). Terry stops, designed to protect police officers in their investigations, may occur when there is reasonable suspicion to believe that criminal activity is afoot, even where there is not probable cause to arrest. See United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003) (warrantless investigatory stops are allowable if, and to the extent that, police officers have reasonable suspicion of wrongdoing that is based on specific, articulable facts); LaFave, supra, § 9.4; Florida v. Royer, 460 U.S. 491, 498 (1983). Reasonable suspicion is a less demanding standard than probable cause. United States v. Golab, 325 F.3d 63, 66 (1st Cir. 2003). Once the stop has occurred, an officer may search a suspect's person for weapons based on reasonable suspicion that the person is armed and

-14-

dangerous. <u>Terry</u>, 392 U.S. at 27.[2] When the officer suspects a crime of violence, the same information that will support an investigatory stop will, without more, support a protective search. <u>Id.</u> at 33; <u>United States</u> v. <u>Scott</u>, 270 F.3d 30, 41 (1st Cir. 2001). Defendants argue only that <u>Terry</u> does not justify a command to step out of the doorway. They do not argue that <u>Terry</u> precluded the police, standing outside and knocking, to ask the man (who opened the curtain) to go to the doorway to talk to the police. Nor do they argue that Beaudoin went involuntarily to the door and opened it. So this is more like a situation in which a person voluntarily stops, and then the police take reasonable steps, during that temporary stop, to protect themselves during the questioning.

These doctrines are not firm-line tests. "The governing caselaw under the Fourth Amendment does not yield very many bright line rules. This is not surprising since the ultimate touchstone is one of reasonableness . . . ." <u>Joyce</u> v. <u>Town of Tewksbury</u>, 112 F.3d 19, 22 (1st Cir. 1997).

When the police were informed of the anonymous call reporting both drug dealing and a dead body, they were certainly

---

[2]Several courts have found that <u>Terry</u> does not justify intrusions <u>into</u> the home. <u>See</u> <u>LaLonde</u> v. <u>Riverside</u>, 204 F.3d 947, 954 (9th Cir. 2000); <u>United States</u> v. <u>Winsor</u>, 846 F.2d 1569, 1577-78 (9th Cir. 1988) (en banc). But this issue is not before us -- the issue, as described below, does not arise from an intrusion into the home or motel room.

-15-

justified in promptly going to the motel to investigate.[3]  Not surprisingly, nothing visible at the motel either disproved the report nor particularly confirmed it.  As such, it was reasonable for the police, seeing a light on at 5:30 a.m. in the room that the anonymous caller had identified, to assume that someone was in the room and to knock on the door.  Once the police heard movement in the room and saw someone open the curtain, it was reasonable for them to ask that person to go to the door so they could speak with him.  See Illinois v. Lidster, 124 S.Ct. 885, 890 (2004) (law enforcement officials can permissibly "seek the voluntary cooperation of members of the public in the investigation of a crime").

Beaudoin did not fully open the door in response to the officers' request; rather, he opened it just enough so that his face was visible.  The officers could not see Beaudoin's hands, nor could they see any part of the room that was within easy reach of the doorway.  It is at this point that the issue of officer safety arose.  The relevant facts are those that were known to the police at the time of the exigency.  See Banks, 124 S. Ct. at 527.  The police knew that a 911 call had been made within the half-hour stating that both a crime (drug dealing) and a death (possible

---

[3]The motel was familiar to the police; they had been called there before in criminal matters.  Drug deals in Maine motel rooms have certainly happened before.  See, e.g., United States v. Julien, 318 F.3d 316, 318 (1st Cir. 2003).

crime) had happened in the motel room. If the phone report was true, the man in the doorway probably was involved in either or both of the reported activities and might even be a murderer; the man might well be armed and might have companions in the room. The association between drug dealing and guns is well known. The officers could not verify that the man was not armed because of the way he had opened the door, nor could they tell if he had a weapon close at hand. The partially opened doorway to the small motel room was not a safe place for the police to investigate whether the man was armed, in this situation. Additionally, the officers had heard noises from inside the room and thus had reason to suspect that at least one other person besides the man at the door was inside.

In the end, this case turns on whether it was reasonable for Sergeant Chamberlain to ask Beaudoin to step out of the doorway.[4] It matters not, in these particular circumstances, whether the request was in essence a command. We will assume arguendo that Beaudoin did not feel free to ignore the officers'

_____

[4]This is not, then, an issue of a search inside of a person's home or motel room or of the arrest of a person in a doorway. Indeed, even in the situation of arrests pursuant to warrant in the doorways of homes, the law is not clearly defined. In the context of doorway arrests, a more serious intrusion than here, this court has noted "[t]he Supreme Court cases, with Steagald at one pole and Santana at the other, do not definitively resolve [the issue]. Even a quick review of lower court cases reveals that there is no settled answer as to the constitutionality of doorway arrests." Joyce v. Town of Tewksbury, 112 F.3d 19, 22 (1st Cir. 1997).

-17-

summons.  We also assume arguendo that the statement to Beaudoin to step outside was a "seizure," though this is not free from doubt.[5] The issue is whether the command was justified under the combination of the three doctrines.  The Fourth Amendment question is not whether Beaudoin acted reasonably that morning; the question is whether the officers' response to Beaudoin's actions was reasonable in context.  Nor is the issue whether the officers had probable cause to arrest Beaudoin and enter the room based solely on the anonymous tip; we need not decide that.  See Florida v. J.L., 529 U.S. 266, 270-71 (2000).

There may, of course, be exigent circumstances posing a threat to officers and justifying reasonable responses even in the absence of probable cause to arrest.  The notion is abhorrent that police who are investigating a crime and suddenly find themselves at risk are precluded from acting reasonably in response to that risk merely because they have not yet established probable cause to make an arrest for a crime.  Finally, the question presented here is not whether the anonymous tip alone, absent any risk of injury to the officers, justified the command to step out of the doorway. Nor is any abstract issue raised about the application of Terry to persons in doorways absent the emergency and exigent circumstances present here.

---

[5]Consider, for example, if Beaudoin had already left the doorway and the officer simply instructed Beaudoin to step closer to him.

As the Supreme Court has emphasized, determining whether the officers' actions were reasonable in the context of exigent circumstances requires balancing the need for the warrantless search or seizure against the harm to the individual whose privacy is being intruded upon in light of all the circumstances. See United States v. Banks, 124 S. Ct. 521, 525 (2003) (whether exigent circumstances justify police action depends on a reasonableness inquiry based on the totality of the circumstances). Courts engaging in this balancing must be wary of overlaying a "categorical scheme on the general reasonableness analysis" and thus "distort[ing] the 'totality of the circumstances' principle, by replacing a stress on revealing facts with resort to pigeonholes." Id. at 528.

Here, the harm to Beaudoin in being commanded (assuming he was commanded) to step out of the doorway of his motel room was relatively small. The police did not order Beaudoin out of the doorway until he had voluntarily opened the door and spoken with them. To the extent this was a seizure, it was more akin to the temporary detention involved in a Terry stop. The police did not enter the motel room here, but merely told (or perhaps, requested) Beaudoin to step outside of his doorway. This is entirely in keeping with the basic rationale of Terry: a brief "seizure" in these circumstances protected police safety and facilitated the investigation while minimizing the intrusiveness of the invasion on

-19-

Beaudoin's privacy. We do not say that Beaudoin relinquished all expectations of privacy merely by opening his door; still, it was less intrusive for the police to tell him to step outside at that point than it would have been if Beaudoin had not himself come partially outside by opening the door. Cf. U.S. v. Santana, 427 U.S. 38, 42 (1976) (there is no expectation of privacy in the doorway to one's home because one is knowingly "exposed to public view, speech, hearing, and touch as if [one] had been standing completely outside [one's] house").

A police command to step out of the opened door of one's motel room is, nonetheless, a non-trivial invasion of privacy. But balanced against the objective safety concerns of the officers here, and in light of the call about an emergency, it was reasonable. See United States v. Sargent, 319 F.3d 4, 10-12 (1st Cir. 2003) (officers had reasonable suspicion of danger in executing a search warrant at an apartment that they knew contained drugs and numerous knives when there was a five-second delay between the police announcement of their presence and the opening of the door); United States v. Bartelho, 71 F.3d 436, 442 (1st Cir. 1995) (noting the importance of the police officers' safety in the exigent circumstances analysis).

Telling Beaudoin to step outside was an effective way for the officers to alleviate their significant safety concerns. First, it assured the officers that Beaudoin was not holding a

loaded gun in his hands and that he was not within easy reach of a weapon. Second, it allowed the police to ask Beaudoin some questions while putting some distance between themselves and other persons potentially in the room. Finally, asking Beaudoin out of the room allowed the police to perform a pat down unhindered by a door frame and to subdue Beaudoin if necessary.

An argument may be made that there were alternatives available to the police. The officers could have attempted first to contact the motel manager or to telephone to see if there were people inside of the room. But most of those alternatives were available several steps earlier in the process and were hardly required. Realistically, they were no longer available once Beaudoin opened the door as he did. There is also a suggestion that the officers should not have asked Beaudoin to step out of the doorway at all once he opened it; they should have simply retreated from the area. The officers had reasons to fear being shot if they retreated. The police would have been foolish either to back away or to turn their backs on Beaudoin. For the officers to ascertain whether he had weapons, in light of the information they had, was eminently sensible. Moreover, delay risked the life of the person in the room reported to be dead, if there were such a person.

None of the officers' actions after Beaudoin stepped out of the doorway justifies suppressing the evidence. Once Beaudoin stepped out of the doorway, it was reasonable for the officers to

ask him if he had a weapon. And when Beaudoin said that he had a knife and reached for his pocket, it was reasonable for the officers to do a quick pat down. After finding the knife and two drug pipes, it was reasonable for them to enter the room, given the information about the drug deal and the dead body.

The fact that the other two officers had not waited long before entering the room and frisking Champagne (while Beaudoin was questioned and frisked outside) need not be addressed in these circumstances. Under the inevitable discovery doctrine, the officers would inevitably have entered the room and frisked Champagne once the results of frisking Beaudoin were known. And, inevitably, they would have arrested him, once they found what was in his pockets. See United States v. Scott, 270 F.3d 30, 42 (1st Cir. 2001). This is what the district court concluded and we agree. Had Beaudoin not had drugs and a weapon on him, this court would be faced with a much different question about the police entry into the room.

One essential purpose of the Fourth Amendment is to impose a standard of reasonableness on the exercise of discretion by the police in order to safeguard "the privacy and security of individuals against arbitrary invasions." Delaware v. Prouse, 440 U.S. 648, 653-54 (1979) (internal quotation marks omitted). This is distinctly not a case in which the raw question is presented of whether police may barge into someone's home or even motel room

-22-

merely based on the receipt of a tip that there is a dead body inside. The concerns raised by such a scenario are very serious. Anonymous tips, without more, do not justify free-wheeling police action. J.L., 529 U.S. at 270. It is easy for someone to make an anonymous 911 call to the police with a false report of a dead body in a room in order to set up the people in that room. This case shows exactly that: Beaudoin and Champagne were set up by the anonymous tipster. Equally, though, society expects police to investigate reports of dead bodies, and to do so promptly. The reportedly "dead" body might yet be alive and prompt action could save the person. See Wayne, 318 F.2d at 212 ("Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients . . . . Even the apparently dead often are saved by swift police response.").

Fourth Amendment analysis is renownedly fact specific; a step-by-step analysis is inherent in the claim. Defendants, ably represented by counsel, argue that the court should not do a step-by-step analysis of the officers' actions, but should back up and instead take a look at the entire picture. Courts must do both. There may indeed be rare cases where the entire picture reveals that the reasonableness of each succeeding step was so marginal that an overall conclusion of unreasonableness is warranted. Still, defendants' disavowal of a step-by-step approach relies too

much on doctrinal categories, and not enough on the facts of the case. The Supreme Court expressly disapproved of such an approach in Banks, 124 S. Ct. at 528.

We emphatically do not create an anonymously reported murder scene exception to the warrant requirement, nor do we adopt a broad emergency aid doctrine, as defendants fear. There are valid concerns about the harm to Fourth Amendment interests from a generous interpretation of the emergency doctrine as an exception to the warrant requirement. This case does not, in the end, turn on the emergency doctrine alone but turns also on the exigent circumstance of risk to the officers, a risk that justified telling Beaudoin to step out of the doorway and is a justification for the Terry doctrine. From that, all else followed.

**B. Sentencing Issue**

Champagne appeals the district court's two-point increase in his offense level for possession of a dangerous weapon. He contends that it was clearly implausible that the circular saw found in the motel room could have been used as a weapon because it was unwieldy and had to be plugged in to be operational. The district court judge was required to impose the enhancement if the defendant possessed a dangerous weapon "unless it [was] clearly improbable that the weapon was connected with the offense." U.S.S.G § 2D1.1(b)(1), cmt. n.3 (2003). Our review is only for

-24-

clear error.  <u>United States</u> v. <u>Picanso</u>, 333 F.3d 21, 25 (1st Cir. 2003).

Champagne's arguments do not demonstrate clear error. The safety cover of the saw was duct-taped so the saw's blade could be engaged more easily.  And the incongruous presence of the saw in a motel room must be considered in conjunction with the fact that Champagne, as a convicted felon, knew that he could not lawfully possess a weapon.  Under these circumstances, the district court did not commit clear error in applying the sentencing enhancement for possession of a dangerous weapon.

**IV.**
**Conclusion**

The denials of the defendants' motions to suppress are **<u>affirmed</u>**.  Champagne's sentence is **<u>affirmed</u>**.


**Dissenting opinion follows.**

**LIPEZ**, <u>Circuit Judge</u>, **dissenting**.  The majority concludes that the Hooksett police officers did not violate the Fourth Amendment's protections for a private residence when they directed Rodger Beaudoin to step outside of his motel room.  In reaching this result, the majority does not rely on the emergency exception doctrine, which provided the basis for the district court's decision, nor does it accept the government's alternative argument that the seizure of Rodger Beaudoin was equivalent to an on-the-beat, non-residential <u>Terry</u>-stop to which the Fourth Amendment's warrant requirement does not apply.  Rather, the majority adopts a novel amalgam of Fourth Amendment doctrines that combines the emergency exception doctrine, the traditional exigent circumstance of risk to the safety of police officers, and the <u>Terry</u> doctrine to uphold the officers' actions under the Fourth Amendment.  Absent from this analysis is any consideration of whether the command to Beaudoin was supported by probable cause to believe that a criminal offense had been or was being committed, or probable cause to believe that an individual's life or safety was in danger within the defendants' motel room.  Because I believe that the majority's approach is irreconcilable with long-established Fourth Amendment jurisprudence, I respectfully dissent.

As I will explain more fully below, under <u>Payton</u> v. <u>New York</u>, 445 U.S. 573 (1980), and its progeny, the Fourth Amendment prohibits searches and seizures inside a private residence unless

-26-

they are conducted pursuant to a warrant or are supported by exigent circumstances and probable cause (or, in the emergency context, by exigent circumstances amounting to probable cause). The Terry doctrine, which permits minimally-intrusive, warrantless stops based on reasonable suspicion of unlawful activity, does not apply to residential searches and seizures. Moreover, for Fourth Amendment purposes, an overnight guest temporarily residing in a hotel or motel room is accorded the same protections as a person residing in his private residence. In my view, the police officers' order to Beaudoin constituted a seizure of his person from his private residence that implicated Payton's heightened protections for the home. That seizure was not supported by probable cause of criminal activity or probable cause of a danger to the life or safety of an individual within the defendants' motel room. Therefore, I would vacate the district court's order denying the defendants' motion to suppress.

## I.
## Fourth Amendment Requirements for
## Residential Searches and Seizures

The Fourth Amendment's protections hold particular importance for searches and seizures within a private residence.[6]  In Payton v. New York, the Supreme Court explained that:

> The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home – a zone that finds its roots in clear and specific constitutional terms. . . . In terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.

445 U.S. at 589-90 (emphasis added).  The Fourth Amendment's warrant requirement serves as the primary safeguard against unlawful searches and seizures within the home.  Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (noting that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").  These heightened Fourth Amendment protections for the home unmistakably apply to seizures of individuals who reside in hotel or motel rooms as overnight guests.  Stoner v. California, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding

---

[6]The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized."  U.S. Const., amend. 4.

house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.")(internal citation omitted); United States v. Bardacchino, 762 F.2d 170, 175-76 (1st Cir. 1985) (defendant "had the same right of privacy [against a warrantless forced entry into his motel room] that one would have against an intrusion into one's private dwelling"). Thus, when Beaudoin partially opened the door to his motel room in response to a police knock and request, he was entitled to no less constitutional protection against unreasonable searches and seizures than if he had opened the door to his private residence.

A warrantless search of a residence violates the Fourth Amendment's proscription against unreasonable searches and seizures "unless the search comes within one of a 'few specifically established and well-delineated exceptions'" to the Fourth Amendment's warrant requirement. United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 2003) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). In the context of a residential search or seizure, these specifically established exceptions consist of either consent, or exigent circumstances and probable cause. As the Supreme Court has recently reaffirmed, "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into the home." Kirk v. Louisiana, 536 U.S. 635, 638 (2002); see also Arizona v. Hicks, 480 U.S. 321, 328

(1987) ("A dwelling-place search, no less than a dwelling-place seizure, requires probable cause."); United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997) ("While the warrant requirement [for a residential search or seizure] may be dispensed with in certain exigent circumstances that are few in number and carefully delineated, the probable cause requirement is rigorously adhered to.") (internal citation and quotation marks omitted). Exigent circumstances exist where law enforcement officers confront "a compelling necessity for immediate action that would not brook the delay of obtaining a warrant." United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995). Probable cause requires that "the officers at the scene collectively possess[] reasonably trustworthy information sufficient to warrant a prudent policeman in believing that a criminal offense had been or was being committed." Id.

Under a traditional Fourth Amendment analysis, the lawfulness of the Hooksett police officers' search and seizure of the motel room and of the defendants turns on the initial question of whether Beaudoin exited the motel room voluntarily or whether he did so only in response to a police order. This question is important because a police order to exit your private residence is tantamount to a police seizure of your person within that residence. As the Supreme Court has explained, a person has been seized for Fourth Amendment purposes if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed

that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). If a reasonable person in Beaudoin's position would have believed that he was not free to remain inside the motel room because of the force of the police order and apparent authority, then the police constructively entered Beaudoin's room to effect a seizure within the meaning of the Fourth Amendment. See United States v. Saari, 272 F.3d 804, 809 (6th Cir. 2002) (police officers' conduct constituted a constructive entry where they "summoned Defendant to exit his home and acted with such a show of authority that Defendant reasonably believed he had no choice but to comply"). On the other hand, if a reasonable person in Beaudoin's position would have believed that he was free to decline to exit the motel room, the directive was not a seizure and did not implicate the Fourth Amendment's proscription against unreasonable searches and seizures.

Although the district court did not explicitly decide whether Beaudoin voluntarily stepped outside of the room, it described the evidence on this point as "equivocal" in its written decision and noted that it was "by no means clear that Beaudoin voluntarily exited the room." It further noted, at the suppression hearing, that "Mr. Beaudoin was not free under those circumstances to shut the door and decline to come out of the hotel. He was coming out of the hotel whether he wanted to or not." The government always bears the burden of proving the existence of an exception to the

Fourth Amendment's warrant requirement. United States v. Jeffers, 342 U.S. 48, 51 (1951). Where a warrantless search or seizure is purportedly justified by the defendant's consent, "the prosecution [must] show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given." United States v. Marshall, 348 F.3d 281, 285-86 (1st Cir. 2003). Given the sharp discrepancy between the two officers' testimonies, I would read the district court's observations as a finding that the government failed to establish by a preponderance of the evidence that Beaudoin freely and voluntarily consented to step outside of the motel room.[7] Indeed, the conflicting testimony of the officers would seem to preclude any finding that the government met its burden of proof on its claim that Beaudoin exited the motel room voluntarily. Therefore, I would conclude that the police officers' order to Beaudoin to step outside constituted a seizure of his person from his motel room.

Whether Payton's heightened protections for the home apply in this case depends not only upon whether the order to Beaudoin

---

[7]The majority characterizes the two officers' testimonies as "slightly varying accounts" and suggests that the differences between them "turn out to be immaterial." In my view, the differences between the officers' testimonies are substantial and significant. While Pinardi testified that he requested that Beaudoin step outside, Sergeant Chamberlain, when asked by the court whether he asked Beaudoin to step outside or ordered him out, responded: "I — I told him to come out, so I would say that I ordered him out." He later testified that Beaudoin was not free to refuse this directive, explaining that if Beaudoin had refused to come out, Chamberlain would have gone in after him.

constituted a seizure but also upon whether it was a <u>residential</u> seizure. While one can argue in some cases about where the entrance to a private residence begins, the Fourth Amendment's warrant requirement and protections for the home are either implicated by a given search or seizure or they are not. In <u>Kyllo</u> v. <u>United States</u>, 533 U.S. 27, 30 (2001), the Supreme Court reaffirmed <u>Payton</u>, explaining that: "We have said that the Fourth Amendment draws 'a firm line at the entrance to the house.' That line, we think, must be not only firm but also bright." On the external, public side of <u>Payton</u>'s firm line, a police officer's conduct is not subject to <u>Payton</u>'s protections. On the internal, residential side of this line, police officers must obtain a warrant supported by probable cause prior to conducting a non-consensual search or seizure, or demonstrate that their actions are justified by exigent circumstances and probable cause.

The important question in this case, therefore, is not whether the police conduct was intrusive, non-intrusive, or something in between when weighed against Beaudoin's reasonable expectation of privacy, but whether the Fourth Amendment's warrant requirement and heightened protections for the home were implicated by the challenged police conduct. If the police officers' seizure of Beaudoin had taken place outside of the motel room, the Fourth Amendment's warrant requirement would not apply, and the police officers' directive to Beaudoin might be understood as the

equivalent of a brief, investigative Terry stop, which requires only a "reasonable suspicion of wrongdoing – a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime" in order to meet the Fourth Amendment's reasonableness requirement. United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003) (citing Terry v. Ohio, 392 U.S. 1, 20 (1968)). The reasonable suspicion standard is "an intermediate standard requiring more than unfounded speculation but less than probable cause." United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1981)). In evaluating whether a Terry stop was justified by reasonable suspicion, the reviewing court must examine "'the totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particular and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). In the course of a legitimate Terry stop, a police officer may conduct a frisk of the suspect, searching his or her person for weapons, "on reasonable suspicion that the suspect is armed and dangerous." United States v. Scott, 270 F.3d 30, 31 (1st Cir. 2001), cert. denied 535 U.S. 1007 (2002).

In arguing that the seizure of Beaudoin was justified under the Terry doctrine, the government suggested that under the Supreme Court's decision in United States v. Santana, Beaudoin had no reasonable expectation of privacy in his motel room once he opened

the door to the police.  See United States v. Santana, 427 U.S. 38, 40 n.1, 42 (1976) (holding that a suspect "was in a public place" and could be arrested without a warrant where she was standing "directly in the doorway . . . not merely visible to the public but [] exposed to public view, speech, hearing, and touch, as if she had been standing completely outside of her house").  The government relied on the Second Circuit's opinion in Gori v. United States, which found that the Santana doorway exception permitted a Terry-type investigatory stop based on reasonable suspicion where defendants voluntarily opened the door of their apartment to public view in response to the knock of a delivery person they had invited.  230 F.3d 44, 53 (2d Cir. 2000); c.f. Saari, 272 F.3d at 811 (finding that Terry did not apply where the defendant was forcibly summoned out of the house at the command of the police and did not voluntarily relinquish Payton's heightened protections for the home).

In my view, the Santana doorway exception does not obviate the need in this case for a warrant or exigent circumstances plus probable cause.  Unlike the defendants in Gori, who "opened [their apartment] to public view . . . in response to the knock of an invitee" and therefore had "no expectation of privacy as to what could be seen from the hall," Beaudoin opened the interior door of his motel room in response to a knock and request by law

enforcement officials.[8]  Moreover, he opened the door just enough to reveal his face, exposing nothing inside the room.  He did not relinquish his and Robert Champagne's reasonable expectation of residential privacy.  Thus, when the police ordered Beaudoin to step outside, he was not in a place where Terry's reasonable suspicion analysis would apply in lieu of the probable cause basis required for a search or seizure within a private residence.  Because Beaudoin did not voluntarily step outside of the motel room or voluntarily expose the room to public view, Payton's heightened protections for private residences apply in this case.

## II.
### Fourth Amendment Doctrines and the Majority's Exigency/Emergency/Terry Approach

As noted above, the majority does not uphold the warrantless seizure of Beaudoin based on the presence of exigent circumstances plus probable cause nor does it affirm the district court's denial of the motion to suppress under the emergency exception doctrine. It also does not adopt the alternative argument advanced below by the government that the order to Beaudoin did not take place within Beaudoin's private residence and thus constituted a Terry stop that was justified solely on the ground of reasonable suspicion of unlawful activity.  Instead, the majority's analysis "involves the

---

[8]Pinardi and Chamberlain testified that Beaudoin opened the main, inside door to the motel room, leaving an outer, screen door between Beaudoin and the officers. The record does not resolve the question of when the screen door was opened, or by whom.

intersection of several Fourth Amendment doctrines, most notably, those of exigent circumstances, emergencies, and Terry-type temporary detentions during investigation." Under this analysis, "the issue is whether the command [to Beaudoin] was justified under the combination of the three doctrines." This combination of Fourth Amendment doctrines is an innovation. To my knowledge, no other court has combined the traditional exigent circumstances doctrine, the emergency exception doctrine, and the Terry doctrine to justify a residential search or seizure. The outcome of this unusual mix is an analysis that is, in my view, at odds with each of the doctrines it purports to adopt.

## A. The Terry Doctrine

The majority's emergency/exigency/Terry approach removes the Terry doctrine from its constitutional moorings and extends the doctrine to the seizure of a person from his private residence. First, the majority suggests that the Terry doctrine applies to the police officers' order to Beaudoin because Beaudoin stopped voluntarily when he opened the curtain to his motel room and answered the knock at his door. Thus, the majority claims that the circumstances that culminated in the order to Beaudoin to exit his motel room were like "a situation in which a person voluntarily stops, and then the police take reasonable steps, during that temporary stop to protect themselves during the questioning."

-37-

Although the majority is correct that once a <u>Terry</u> stop has occurred, "an officer may search a person for weapons based on reasonable suspicion that a person is armed and dangerous," the voluntary actions that the majority describes do not constitute the involuntary, investigative <u>Terry</u> stop (the seizure) that is the premise of the <u>Terry</u> analysis. Indeed, the so-called voluntary "stop" of Beaudoin within the motel room seems to be offered as a substitute for the involuntary <u>Terry</u> seizure, which would require reasonable suspicion that Beaudoin had committed, was committing, or was about to commit a crime.

More importantly, the majority's analysis overlooks the critical fact that Beaduoin was inside his motel room when he looked out the window and responded to the officers' knock by opening the door to his motel room just far enough to reveal his face. This situation differs in constitutionally significant ways from a situation in which police officers conduct a voluntary stop of an individual in a public setting. In order to place Beaudoin in a situation where <u>Terry</u>'s reasonable suspicion standard might apply, the officers had to order him to exit his room. <u>Terry</u> did not justify that command because <u>Terry</u> does not apply to seizures of individuals from their private residences. Although the majority observes that "[w]hen the officer suspects a crime of violence, the same information that will support an investigatory

stop will without more support a protective search," it is the stop, not the protective search, that is at issue in this case.

The majority's blend of Fourth Amendment doctrines overlooks the importance of place in determining whether a minimally intrusive seizure can be justified under Terry's reasonable suspicion standard. The majority cautions that this case does not present "any abstract issue . . . about the application of Terry to persons in doorways absent the emergency and exigent circumstances present here."[9] Yet Terry's applicability to the order to Beaudoin does not turn on the presence or absence of exigent circumstances but on the physical location of Beaudoin and the police officers at the time of the seizure. Terry itself distinguished police conduct "predicated upon the on-the-spot observations of an officer on the beat — which historically has not been and as a practical matter could not be, subject to the warrant procedure" from "conduct subject to the Warrant Clause of the Fourth Amendment." Terry, 392

_____

[9]While the majority acknowledges that "[s]ome courts have found that Terry does not justify intrusions into the home," it insists that "[t]his issue is not before us — the issue, as described below, does not arise from an intrusion into the home or motel room." However, insofar as Beaudoin was positioned on the residential side of Payton's firm line at the time that he opened the inner door of his motel room, the officers' seizure of his person was subject to the Fourth Amendment's warrant requirement, and the Terry doctrine did not apply. See, e.g., United States v. Winsor, 846 F.2d 1569, 1577-78 (9th Cir. 1988) (holding that Terry's reasonable suspicion standard could not justify a constructive search that was conducted as police officers peered through the doorway into the defendant's home); Saari, 272 F.3d at 809 (holding that Terry did not apply where police officers ordered the defendant to exit his home).

U.S. at 20. Terry dealt with the former category of conduct and did not require exigent circumstances or probable cause to justify the warrantless seizure — because a warrant was not required in the first place. By contrast, if the situation in Terry involved conduct subject to the Fourth Amendment's warrant requirement, the Court "would have [had] to ascertain whether 'probable cause' existed to justify the search and seizure which took place." Id.

Thus, the majority's incorporation of Terry into an exigency/emergency analysis overlooks the constitutional difference between police conduct in the home and police conduct outside it.[10] This approach represents a significant departure from well-established Fourth Amendment doctrine, under which residential seizures must be supported by a warrant or exigent circumstances and probable cause, whereas seizures short of arrest that are conducted outside of the home do not require a warrant and may be justified under Terry's reasonable suspicion standard. The command to Beaudoin to exit his motel room constituted a seizure of Beaudoin from his private residence. It was an intrusion of

_____

[10] Although the majority assumes, arguendo, that the order to Beaudoin was a seizure of his person, it suggests that the order may not have been a seizure after all, inviting us to "[c]onsider, for example, if Beaudoin had left the doorway, and the officer simply instructed Beaudoin to step closer to him." This example again misapprehends the significance of place. Whether the officers' directive was a seizure for Fourth Amendment purposes turns on the nature of the order, not the location of Beaudoin. On the other hand, Beaudoin's location is relevant in determining whether that order was a residential seizure that implicated the Fourth Amendment's warrant requirement or whether it was a nonresidential seizure equivalent to an on-the-beat Terry stop.

-40-

significant import that required a search warrant or exigent circumstances plus probable cause. Therefore, Payton, not Terry, applies in this case.

## B. The Exigent Circumstances and Emergency Doctrines

Just as the majority's approach is inconsistent with the Terry doctrine, so too it cannot be reconciled with the traditional exigent circumstances doctrine or the emergency exception doctrine.

### 1. The Exigent Circumstances Doctrine

Under a traditional Fourth Amendment analysis, exigent circumstances present an exception to the Fourth Amendment's warrant requirement for residential searches and seizures. Exigent circumstances involve a "compelling necessity for immediate action as w[ould] not brook the delay of obtaining a warrant." United States v. Wilson, 36 F.3d 205, 209 (1st Cir. 1994)(quoting United States v. Adams, 621 F.2d 41, 44 (1980)). The exigent circumstances analysis is necessarily fact-intensive and is "limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." Tibolt, 72 F.3d at 969. As the majority notes, this circuit has recognized that exigent circumstances may exist where a suspect poses a threat "to the lives or safety of the public, the police officers, or to herself." Hegarty v. Somerset Cty., 53 F.3d 1367, 1375 (1st Cir. 1995).

Yet exigent circumstances alone cannot excuse the Fourth Amendment's warrant requirement for residential searches and seizures. While the majority is correct that a risk to the safety of the public or the police may rise to the level of an exigent circumstance, our case law is clear that this exigency justifies a warrantless residential search or seizure only where it is also supported by probable cause. See, e.g., United States v. Bartelho, 71 F.3d 426 F.3d 442 (1st Cir. 1995); United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993). Thus, the traditional exigent circumstances doctrine requires two separate elements. The exigent circumstance element focuses on circumstances that are incident to the criminal investigation, such as a risk of flight, the destruction of evidence, or a risk to police officer safety. The probable cause element focuses on the suspicion of criminal activity, which must amount to probable cause to believe that a crime has been or is being committed. In the absence of a valid search warrant or consent, both elements must be present in order to justify a search or seizure within a private residence.

## 2. The Emergency Exception Doctrine

The Supreme Court has recognized that some emergencies may obviate the need to obtain a warrant prior to entering a private residence, Mincey v. Arizona, 437 U.S. 385, 392 (1978), and numerous state and federal courts have upheld emergency entries and searches of private residences based on the need to render

emergency aid.  See United States v. Holloway, 290 F.3d 1331, 1336-37 (11th Cir. 2002) (collecting cases).  In contrast to the traditional exigent circumstance case, in which the exigency presents itself in the course of a criminal investigation and requires probable cause of criminal activity, a search or seizure that falls under the emergency exception doctrine may be only incidentally connected to unlawful acts.  Police officers responding to emergency situations are responding to the need to locate and provide assistance to a person whose life may hang in the balance rather than the search for evidence of criminal activity.

As the Fourth Circuit has explained, "[t]his particular exigency is expressed as one of [a] reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992).  A Fourth Amendment issue arises in these emergency exception cases only when someone becomes the subject of a search or seizure within the protected area, usually because the police discover evidence of criminal activity while searching for the individual believed to be in need of aid.[11]

---

[11]The emergency exception doctrine must be distinguished from the "special needs" exception to the Fourth Amendment's warrant and probable cause requirements.  The latter exception provides that "a residential search pursuant to an established warrantless search *procedure*, may be reasonable if conducted in furtherance of an

In such cases, the reasonableness of the search or seizure does not depend on the existence of probable cause to believe that criminal activity had been or was being committed. Indeed, the law enforcement officers initially may not be aware of any connection between the emergency and a crime. Instead, the reasonableness of the intrusive action under the emergency doctrine depends on the objective probability that someone's life or safety is in danger within a setting protected by the Fourth Amendment.

Thus, the emergency exception suggested by Mincey, and adopted in various forms by state and federal courts, does not dispense with the Fourth Amendment's probable cause requirement. In applying the emergency doctrine, other circuits have found that the Fourth Amendment requires a standard of suspicion approximating probable cause to justify a warrantless search or seizure in a private residence under the emergency exception doctrine. While the phrasing of the applicable standard varies, I agree with the Second Circuit that probable cause exists in the emergency context where there exists a probability that an individual's life or safety is in danger within an area protected by the Fourth

___

important administrative or regulatory purpose, or 'special need,' which would be undermined *systematically* by an impracticable warrant or probable-cause requirement." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996)(emphasis in the original)(applying the exception to a municipal policy allowing warrantless entries into private residences for the purpose of executing involuntary commitment papers).

Amendment.  See Koch v. Town of Brattleboro, 287 F.3d 162, 169 (2d Cir. 2002) (probable cause under the emergency doctrine requires "a probability that a person is in danger").  Courts that have found that the emergency doctrine requires a "reasonable belief" or a "reasonable basis for believing" that someone is in danger have also essentially applied a probable cause test.  See, e.g., Holloway, 290 F.3d at 1338 ("[I]n an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger."); 3 LaFave, Search and Seizure § 6.6(a), at 393 ("There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.")(quoting People v. Mitchell, 39 N.Y.2d 173, 177-78 (1976)).

Whether articulated as a reasonable belief or a probability, the probable cause element of the emergency doctrine requires the same heightened standard that applies to other warrantless searches and seizures in a private residence where the object of the search and seizure is criminal activity.  However, under the emergency doctrine, the separate elements of exigent circumstances and probable cause come together.  In other words, probable cause in the emergency context focuses on the threat to an individual's life or safety – that is, on the exigency itself.  Unless the objective basis for suspicion of an emergency rises to the level of probable

cause, a warrantless residential search or seizure violates the Fourth Amendment.

### 3.   The Majority's Approach

The majority never claims that the anonymous call reporting a failed drug deal and possible dead body, and the light inside of the defendants' motel room, provided an adequate basis for a warrantless entry into the room under the traditional exigent circumstances doctrine or the emergency exception doctrine.   At most, the majority's analysis suggests that the facts known to the officers relating to the possible emergency and crime justified their decision to approach the defendants' motel room and knock on the door.   I agree with that proposition.

However, Beaudoin had no obligation to open that door, even in response to a knock and request of the police.   Because the officers did not have a warrant, Beaudoin could have simply told them to go away.   In that case, the officers would have been required to explore other investigative options until they could develop sufficient probable cause to support a search warrant.

Yet Beaudoin responded to the officers' knock by opening the inner door to his motel room, revealing only his face.   At that critical moment, the majority introduces the exigent circumstance of the risk to the officers' safety.   According to the majority, the police officers had a reasonable basis to believe that their safety was at risk based on the information provided by the

anonymous call,[12] the sounds that they heard inside of the room, and the way that Beaudoin opened the door. As the majority explains: "[t]he partially opened doorway to the small motel room was not a safe place for the police to investigate whether [Beaudoin] was armed, in this situation."[13] Therefore, it concludes that "balanced against the objective safety concerns of the officers here, and in light of the call about an emergency, it was reasonable" to order Beaudoin to step outside of his motel room.

I do not doubt that an officer investigating reports of drug activity and a possible dead body in a motel room has valid grounds for concern about his or her personal safety in standing outside of that room under the circumstances presented here. However, the officers could have addressed their concerns for personal safety by withdrawing from the area around the motel room door in any one of several directions. The door was adjacent to a

_____

[12] The majority points out that Officer Pinardi testified that he believed the call had reported a shooting, as well as a drug deal gone bad and a possible dead body. However, the source of that belief is unclear, and it conflicts with the transcript of the call, which said nothing about a shooting, as well as the testimony of Sergeant Chamberlain, who said nothing about a shooting.

[13] In fact, as noted in footnote 3, supra, Beaudoin initially opened the interior door of the room. The record leaves unclear whether he had pushed open the outer, screen door at the time that the police commanded him from the room.

lit walkway that flanked a circular driveway where the police officers had parked their car in view of the defendants' room. The police did not have to turn their backs to Beaudoin or end their vigilance as they retreated from the area in front of the door. While courts are appropriately reluctant to tell police officers how to carry out their investigatory responsibilities, officers must make investigative choices within the limits of the Constitution. A decision by the Hooksett police officers to withdraw from the area around Beaudoin's door would not mean an abandonment of their investigation of the anonymous call. They could have pursued a number of alternative options, including staking out the scene,[14] questioning other motel residents, or calling Beaudoin's room in an effort to win his consent to a voluntary departure from that room. What the police could not do, however, was use their continued presence outside the motel room door as a basis for disregarding the well-established constitutional prohibition against entering a private residence without a combination of probable cause to believe that criminal activity was occurring within and exigent circumstances or, in a

---

[14]Sergeant Chamberlain recognized the availability of other alternatives, testifying that if the call had reported a drug deal gone bad but not a dead body, the officers would not have ordered Beaudoin to step outside when he guardedly opened the door but would have "put a perimeter up outside the place and tried to develop enough probable cause to at least get a search warrant, and [] would also have at that point called for more help."

pure emergency situation, probable cause to believe that somebody's life or safety is in danger within the private residence.

Implicit in the majority's analysis is the notion that the officers' belief that someone was injured or dying inside of the room justified their continued presence outside of the doorway and, after concerns arose for their own safety, their seizure of Beaudoin. In other words, the police could not have been required to abandon their position in front of the motel room door because they were in the process of investigating a reported emergency. However, the only basis for the officers' belief that someone might be in danger inside the room was an anonymous, uncorroborated 911 call devoid of any details (other than the room number) that did not provide sufficiently reasonable grounds to believe that an emergency existed. Nor was the officers' belief in a possible emergency rendered any more reasonable by their concerns for their own safety or by the fact that they ordered Beaudoin to step outside of his motel room rather than physically entering the room themselves. In essence, when the majority's amalgam of doctrines and its language of reasonableness are probed, it concludes that an anonymous, uncorroborated call trumps the strong Fourth Amendment rule that the police may not enter a private residence without probable cause to do so. This proposition represents a new exception to the Fourth Amendment's warrant and probable cause requirements that cannot be squared with traditional exigent

circumstances analysis or the emergency exception doctrine. Because the officers in this case had no probable cause basis for believing that there was criminal activity or an emergency inside the defendants' room, I would hold that their decision to order Beaudoin from his motel room violated his Fourth Amendment rights.

### III.
### Fourth Amendment Analysis of the Seizure of Beaudoin

### A.   Traditional Fourth Amendment Analysis

Although the district court did not decide this case on traditional Fourth Amendment grounds, it stated at the suppression hearing that "the ordinary exigent circumstances exception, when you're trying to seek evidence of a crime rather than trying to determine if somebody in need of assistance can get that assistance, requires probable cause.  And I agree [with the defendants] that in these circumstances, there is not probable cause present."  Because the majority affirms the decision of the district court under its exigency/emergency/Terry analysis, it does not consider whether the seizure of Beaudoin was justified by probable cause of criminal activity.  I suspect, however, that the majority would agree with the district court, as do I, that the seizure of Beaudoin was not justified by probable cause of criminal activity, notwithstanding the presence of any exigent circumstances.

As noted in Part I, for Fourth Amendment purposes, probable cause exists where "the officers at the scene collectively

possessed reasonably trustworthy information sufficient to warrant a prudent policeman in believing that a criminal offense had been or was being committed." Tibolt, 72 F.3d at 969. The probable cause standard is a fact-specific concept that "deals with probabilities and depends on the totality of the circumstances." Maryland v. Pringle, 124 S. Ct. 795, 800 (2003); see Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003) (noting that whether the requisite probability must be "'more likely than not' [is] . . . arguably unsettled; but, centrally, the mercurial phrase 'probable cause' means a reasonable likelihood"). Like the less demanding standard of reasonable suspicion, probable cause is "dependant upon both the content of information possessed by the police and its degree of reliability. Both factors – quantity and quality – are considered in the 'totality of the circumstances' – the whole picture – that must be taken into account" when evaluating whether a search or seizure was supported by reasonable suspicion or by probable cause. Alabama v. White, 496 U.S. 325, 330 (1990). Of course, probable cause is a more demanding standard than reasonable suspicion, both in terms of the detail of information and the degree of reliability required. See id.

An anonymous tip "seldom demonstrates the informant's basis of knowledge or veracity" and typically fails to give rise to reasonable suspicion, let alone probable cause. Id. at 329 (finding that a detailed anonymous tip that a woman was carrying cocaine and

-51-

predicting that she would leave an apartment building at a specified time, enter a car of a specified description, and drive to a specified motel would not, without further corroboration, have justified a <u>Terry</u> stop based on reasonable suspicion); <u>see</u> <u>Florida</u> v. <u>J.L.</u>, 529 U.S. 266, 271 (2000) (holding that an anonymous 911 call lacked sufficient indicia of reliability for a showing of reasonable suspicion where the caller reported that a young man standing at a particular bus stop wearing a plaid shirt was carrying a gun). The anonymous 911 call to the Manchester police reporting a dead body and failed drug deal in a particular room at a particular motel did not provide anything approaching the degree of detail and specificity that might have supported the veracity of the information. <u>See</u> <u>Khounsavanh</u>, 113 F.3d at 288 (noting that "there may be cases where an informant provides such a wealth of detail, with such a high degree of specificity that it is unlikely that the informant is inventing these assertions, and his veracity is supported through the very specificity and detail of his statement"). The caller did not describe who was involved in the alleged events, when these events took place, how the alleged death occurred, how many people could be found inside the motel room, or how he knew about the information he proffered. In essence, the call consisted of a "bare report of an unknown, unaccountable informant" who provided little detail or predictive information and did not "suppl[y] any basis for believing he had inside

-52-

information" about the defendants or the alleged events at the Kozy 7 motel.  See J.L., 529 U.S. at 271.

It is true that an anonymous tip with predictive detail that is then supported by corroborating facts may demonstrate sufficient reliability to give rise to a reasonable suspicion or, potentially, probable cause, of criminal activity.  See J.L., 529 U.S. at 270; Wood v. Clemons, 89 F.3d 922 (1st Cir. 1996).  However, there was precious little detail or corroboration at the time that the Hooksett police officers knocked on the defendants' motel room door and ordered Beaudoin to step outside.  Arriving at the motel at about 5:30 a.m., the officers observed that a light was on inside Room 10, in contrast to the other darkened rooms of the motel. Sergeant Chamberlain noticed movement inside the room and subsequently observed Beaudoin pull back the curtain and look outside in response to the officers' knock on the door.  When Beaudoin opened the door at the request or instruction of the officers, he did so only far enough to reveal his face.

I do not find it out of the ordinary that two individuals would be awake at 5:30 a.m. on a July morning when the sun had already begun to rise.  As Officer Pinardi acknowledged at the suppression hearing, it was "not very dark in July" at that time of morning.  Nor do I think that Beaudoin's decision to look outside the window before answering an early morning knock on his motel room door provides any corroboration of the anonymous and

unidentified tip alleging a homicide or drug deal. As noted, he had no obligation to open the door at all. His hesitancy to voluntarily expose himself and the room to full public view when opening the door in response to a request from police officers visible in their uniforms could provide some indication of a guilty conscience. On the other hand, it could suggest a reasonable concern for safety, or for modesty, when strangers, even uniformed ones, unexpectedly knock on one's motel room door in the early hours of the morning. In any event, considered together, these facts were insufficient to corroborate an anonymous call devoid of details and to provide sufficient indicia of reliability to "warrant a prudent policeman in believing" that Beaudoin and Champagne had committed or were committing an offense inside the motel room. Tibolt, 72 F.3d at 969; see J.L., 529 U.S. at 271 (holding that anonymous call alleging unlawful carriage of gun was not sufficiently corroborated by police observation of suspect matching the description and standing at the location reported by the caller to establish reasonable suspicion justifying a Terry investigative stop of that individual). Hence, under a traditional Fourth Amendment analysis relating to the investigation of criminal activity, there was no probable cause basis for ordering Beaudoin to leave his room.

**B. Emergency Exception Doctrine**

The question here is whether the Hooksett police officers

lawfully ordered Beaudoin to step outside of his motel room under an emergency doctrine that incorporates the Fourth Amendment's requirements for warrantless residential searches and seizures. In addressing this question, I consider whether there existed an objective probability that an individual's life or safety was in danger inside the motel room at the time that the officers ordered Beaudoin to step outside — in other words, whether the risk of an emergency rose to the level of probable cause.

The government claims that emergency circumstances were created by the anonymous 911 call that reported a possible dead body inside a motel room. As several circuit courts have recognized, 911 calls are among the most frequent and widely recognized means of reporting emergencies. See, e.g., Holloway, 290 F.3d at 1339 ("Not surprisingly, 911 calls are the predominant means of communicating emergency situations."); United States v. Richardson, 208 F.3d 626, 630 (7th Cir. 2000) ("A 911 call is one of the most common — and universally recognized — means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help."). When confronted with an emergency situation, police officers generally must act swiftly to investigate and respond to information that someone may be in need of urgent assistance.

Although a homicide scene does not automatically present an exigent circumstance that justifies a warrantless search, see

Mincey, 437 U.S. at 393-94,[15] a 911 report of a dead body may in some circumstances create a reasonable assumption that the reported victim might be alive and in need of immediate aid. See Richardson, 208 F.3d at 631 (concluding that "it was objectively reasonable for the officers to conclude that the situation presented exigent circumstances" based on a 911 report that a woman had been raped and murdered in an apartment). As then-Judge Burger explained in Wayne v. United States:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . [T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if the police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response.

318 F.2d 205, 212 (D.C. Cir. 1963)(dicta). In this case, the 911 call suggested that someone may have been killed as the result of a drug deal. I agree with the district court that a 911 call reporting a potential victim of a drug-related homicide may present an exigency that compels immediate action and justifies forgoing the delay of obtaining a warrant.

---

[15]In Mincey, the Supreme Court found that a four-day search of an apartment after the victims of a shooting had been found violated the Fourth Amendment, explaining that "the warrantless search of [the defendant's] apartment was not constitutionally permissible simply because a homicide had occurred there." Id. at 395.

The analysis does not end there, however. Again, the government must establish that the suspicion of emergency circumstances rises to the level of probable cause in order to validate a warrantless search or seizure within a private residence. The district court concluded that the anonymous 911 call that reported a dead body inside Room 10 of the Kozy 7 Motel "provided both reasonable grounds for effectuating a warrantless attempted rescue of the putative victim and a reasonable basis for doing so within the room specified." The majority apparently does not agree with that conclusion, nor do I.

The relevant facts on this issue are not in dispute. The government agrees that the anonymous 911 call alleging a "drug deal gone bad" and possible dead body provided the basis for the police officers' seizure of Beaudoin. The officers acknowledge that they did not know the identity of the caller or the origin of the call. There is no evidence in the record suggesting that the officers tried to trace the call or conducted any other investigation to corroborate the information that they received or the identity of the caller prior to appearing at the defendants' door.

The concerns with anonymous and uncorroborated tips expressed by the Supreme Court in J.L. under a traditional Fourth Amendment analysis are also relevant in the emergency context. It is true that the J.L. Court recognized that certain emergency situations might justify a reduced showing of reliability regarding anonymous

-57-

tips, explaining that "[w]e do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a person carrying a firearm before the police can constitutionally conduct a frisk." 529 U.S. at 273-74. I recognize that unusually severe and time-sensitive emergencies, such as the report of a bomb, may validate a protective, on-the-street, stop and frisk, even without a showing of reliability. Such an emergency might also justify a search or seizure within a private residence without a showing of probable cause, notwithstanding the heightened privacy interest at stake in such cases. However, an anonymous call alleging a possible dead body inside a motel room does not present the same kind of clear and immediate threat of harm as a report alleging that a person is carrying a bomb. J.L. does not stand for the proposition that an anonymous report of a dead body inside a private residence obviates the need to verify the reliability of the caller or the call.

As in J.L., the caller in this case "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." See J.L., 529 U.S. at 271. Such a call presents a troubling possibility that someone may have placed the call in order to "harass another [by] set[ting] in motion an intrusive, embarrassing police search of the targeted person." Id. at 272. Indeed, Beaudoin and Champagne were set up

by somebody who concocted a phony story about an emergency.[16]  There was no dead body inside Room 10 of the Kozy 7 Motel.  Instead, an unknown person placed an anonymous and unreliable call reporting an emergency that did not exist.

While several circuit courts have applied the emergency doctrine to uphold a warrantless search or seizure in a private residence based on a 911 emergency call, in each case the call at issue was more reliable than the call in this case.  In some cases, the caller was not anonymous.  See Richardson, 208 F.3d at 628 (caller identified himself by name and explained that he lived at the same address as the alleged murder); United States v. Cunningham, 133 F.3d 1070, 1071 (8th Cir. 1998) (caller identified herself).  In another case, the address from which the call was placed was verified by caller identification, and the caller described an immediate and deadly threat of harm to which she herself was being exposed.  Anthony v. City of New York, 339 F.3d 129, 136 (2d Cir. 2003).  In still other cases, the police found corroborating evidence of an emergency when they arrived at the reported location.  See United States v. Jenkins, 329 F.3d 579, 580-81 (7th Cir. 2003) (caller identified herself and called from

_____

[16]This observation does not suggest any sympathy for the plight of the defendants. They were obviously up to no good.  However, their culpable conduct is not at issue here.  The fact that they were set up simply illustrates the reliability problems that are presented by anonymous and uncorroborated tips that become the basis for intrusive police actions.

the location of the alleged assault, and when police officer arrived at that location, he observed that the front door was open and heard sounds of someone standing up and falling down); Holloway, 290 F.3d at 1332-33 (when investigating anonymous report of a violent domestic dispute and gun shots inside a home, police officers discovered individuals on the porch, a shotgun against the house, and several expended and one live shotgun shells on the picnic table and lawn). In none of these cases did the police rely upon an anonymous and uncorroborated emergency call to justify a warrantless search or seizure in a private residence. See Kerman, 261 F.3d at 238 (finding that search violated the Fourth Amendment where it was based on an anonymous and unverified 911 call).

The government did not present the district court with evidence that the Manchester or Hooksett police had any additional, objective reason to believe in the reliability of the caller. See J.L., 529 U.S. at 276 (Kennedy, J., concurring) (noting that instant caller identification and voice recordings of telephone calls may lend reliability to an otherwise unreliable anonymous tip). When the police arrived at the motel, they discovered no commotion, no sign of a disturbance, nothing to indicate that a person had been shot or killed or was in need of emergency assistance. They did not look for a manager or others on the premises to ask if they had heard any disturbance in or around Room 10. Instead, the police seized Beaudoin on the basis of an

anonymous call and evidence of someone awake inside the reported location at 5:30 a.m. and movement inside the room. These meager observations did not provide sufficient corroboration of an anonymous and unidentified call from an unknown location reporting a possible dead body at that address to establish probable cause of a danger to the life or safety of someone inside the motel room. Therefore, when the Hooksett police ordered Beaudoin to step outside of his motel room, they violated his Fourth Amendment right to be free from unreasonable seizures and triggered subsequent searches and seizures of Beaudoin, Champagne, and the room that cannot escape the taint of this original violation.[17]

**IV.**
**Conclusion**

The seizure of Beaudoin was not supported by probable cause of criminal activity or probable cause of a danger to human life or safety. Indeed, it is questionable whether the police officers had even a reasonable suspicion that there was criminal activity in the

---

[17] Because the initial seizure of Beaudoin was unlawful, the government's theory of inevitable discovery as a justification for the ensuing searches and seizures unravels. See Nix v. Williams, 467 U.S. 431, 444 (1984) (holding that if the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received" even if it was obtained by an unlawful search or seizure). Evidence seized under the subsequently executed search warrant is also inadmissible as fruit of the poisonous tree. See generally, Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). It would have been impossible to secure the warrant without the prior unlawful seizure of Beaudoin and the subsequent entry into the motel room and the seizure of Champagne.

room, or an emergency involving someone's life or safety. Yet one of the officers testified that if Beaudoin had not come out of his motel room the police were going to go in. That determination reflects a failure on the part of the officers to understand the constitutional principles that circumscribe their investigative choices.

These constitutional principles do not make the difficult and important job of police officers any easier. However, they cannot be removed from the calculus of reasonableness. In this case, the well-established proposition that the police cannot enter a private residence without probable cause to do so means that the officers made a constitutionally inappropriate choice when their concern for their own safety induced them, with their order to Beaudoin to leave his motel room, to cross the threshold into the protected area instead of withdrawing from the scene to continue their investigation in a manner that would comport with constitutional requirements. Under both traditional Fourth Amendment analysis and the emergency exception doctrine, the officers' conduct in this case violated the Fourth Amendment's proscription against unreasonable searches and seizures. The district court's order denying the defendants' motion to suppress should be vacated, and the motion to suppress granted.